438

Harold N. HORN
v.
UNITED STATES.
No. 260-55.

United States Court of Claims.
Oct. 7, 1959.

Leonard J. Meiselman, New York City, for plaintiff.

John R. Franklin, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant.

PER CURIAM.

This case was referred by the court, pursuant to Rule 45(a), 28 U.S.C.A., to C. Murray Bernhardt, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed April 21, 1959. While plaintiff did within the required time file a notice of intention to except to the commissioner's report, by further notice, filed August 6, 1959, the notice of intention to except was withdrawn. On August 13, 1959, defendant filed a motion for judgment, based on the commissioner's opinion and findings. Since the court agrees with the recommendations and findings of the commissioner, as hereinafter set forth, it hereby adopts the same as the basis of its judgment in this case. Plaintiff

is therefore not entitled to recover and his petition will be dismissed.

It is so ordered.

### Opinion of Commissioner

The plaintiff, a Veterans' Preference eligible who was removed from his position in the New York Naval Shipyard on October 8, 1954, for cause, contends that certain aspects of his discharge proceedings were arbitrary, capricious and procedurally defective, in that—

1. Both at the agency level and on appeal to the Civil Service Commission the defendant relied upon the false testimony of one Rothstein, plaintiff's friend and former fellow employee, which Rothstein later changed to plaintiff's advantage.

2. The Second United States Civil Service Region failed to honor plaintiff's request for the production of certain witnesses.

3. The proceedings before the Second Region were not transcribed verbatim.

The court has previously denied defendant's motion for summary judgment. Because of the allegations of arbitrary action, a trial *de novo* was held before the Commissioner. The testimony of the key witnesses in the administrative proceedings corresponded substantially with that given by the same witnesses before the Commissioner, except for minor inaccuracies easily attributable to fading memory of events long past.

As to the first of the specific grounds cited by plaintiff, on July 12, 1954, at plaintiff's request earlier that day, Rothstein mustered out plaintiff's timecard at quitting time. He was caught in the act by Shipyard employees who had been alerted to the possibility earlier in the day and had stationed themselves strategically to apprehend him. Confronted, Rothstein first denied the obvious, then at a preliminary interview before the Master of his shop on July 14 testified before witnesses that the plaintiff had asked him to muster out for him at the close of day because the plaintiff was going to "take a powder". The plaintiff admits absenting himself from his assigned duties without authorization and "gallivanting about" on a social tour of his Shipyard friends, although he did not leave the Shipyard. Rothstein stuck to his story until August 9, when in a signed statement he retracted his earlier version of the incident and said that what he did he did voluntarily and without plaintiff's complicity or knowledge. It is true, in fact, that plaintiff put in a hasty appearance at the timeclock just after Rothstein had punched him out, but the fact that plaintiff's superiors had gotten wind of the conspiracy beforehand lends irresistable corroboration to the conclusion that the plan was both formed and executed before quick action exposed it and the culprits. Rothstein adhered to his revised story at plaintiff's removal hearing before a Shipyard hearing official, and again before this court. He says now that he was pressured by his superiors into the earlier statement implicating plaintiff through promises of benefit to himself if he came clean, for he too was charged with misconduct in the matter and was subsequently discharged. It was not arbitrary or capricious for the administrative levels to rely upon Rothstein's unrehearsed initial account of the facts and to disregard his changed statement. The Commissioner reaches the same conclusion. By his equivocation Rothstein forfeited any right to belief in a story so obviously concocted to exonerate the plaintiff.

Plaintiff's next complaint of arbitrary or procedurally defective action is addressed to the refusal of the Second Region to honor plaintiff's request to direct the Shipyard to produce two witnesses to appear at the hearing held before the Second Region. The witnesses had testified at length in the Shipyard hearing and had been cross-examined there by plaintiff's attorney. The Second Region, and thereafter the Commission's Board of Appeals and Review, had before them not only the transcript of the Shipyard hearing but also

various Disciplinary Reports and statements by the witnesses. Under these circumstances it cannot be seen how plaintiff was prejudiced. "Proceedings before the Civil Service Commission and its regional agencies need not be cast in the mold of court proceedings", Atkinson v. United States, Ct.Cl. No. 49–56, decided January 14, 1959. In Deviny v. Campbell, 90 U.S.App.D.C. 171, 194 F.2d 876, certiorari denied 344 U.S. 826, 73 S.Ct. 27, 97 L.Ed. 643, a discharged Civil Service employee of the Government Printing Office complained that the appeal proceedings before the Civil Service Commission were defective because he had requested the presence of two fellow employees as witnesses at the Commission hearing and they were not required by the Commission or the agency to appear. Instead, the Commission considered the testimony of these witnesses as it appeared in a transcript of a hearing before a board established by the Public Printer to investigate charges against the plaintiff, together with various memoranda and affidavits from Printing Office personnel. The court held that the Commission does not have the power to subpoena witnesses and that the regulations do not contemplate an adversary proceeding. Nor do they in the instant case. Here, the witnesses in question appeared before the Commissioner and were rigorously cross-examined by plaintiff's counsel. Except for trifling and excusable variances, their testimony confirmed that which they gave at the Shipyard hearing. Had they testified at the Second Region hearing to the same effect as here, the plaintiff would have fallen far short of benefiting himself.

■ Finally, the Second Region denied plaintiff's request that a verbatim transcript of the Region hearing be kept because "in the interest of saving time and money, the record would be summarized and the pertinent testimony included, as provided in the Commission's Regulations". This, the plaintiff says, was arbitrary in a case involving conflicting statements in the agency record.

The Regional office is empowered under the regulations to determine how the hearing will be recorded. 5 CFR 22.605. The summary as prepared was comprehensive. The plaintiff's attorney who represented the plaintiff at the Regional hearing, after receiving a copy of the summary, requested certain changes in it (which were made), and reported that "in all other respects the undersigned believes that the summary is true and correct."

The charges made against the plaintiff were amply established. His contentions and evidence were given a full measure of consideration administratively. The action taken was not arbitrary or capricious, it was based upon substantial evidence, and was not procedurally defective. The petition should be dismissed.

### Findings of Fact

1. Plaintiff is a preference eligible as defined by the Veterans' Preference Act of 1944, as amended (58 Stat. 387, 5 U.S.C.A. 851 et seq.)

2. For the period from June 8, 1942, until October 27, 1943, plaintiff was employed at the New York Naval Shipyard in Brooklyn, New York (hereinafter referred to as the Shipyard), as an Apprentice Electrician. On October 27, 1943, plaintiff entered upon active military duty with the United States Navy and was honorably discharged therefrom on January 7, 1946. On February 19, 1946, plaintiff returned to the Shipyard as Apprentice Electrician, 1st Class, and on June 2, 1947, was promoted to Electrician. Plaintiff was separated from employment at the Shipyard on July 3, 1947, by reduction in force, and on July 31, 1948, received a temporary appointment as an Electrician at the U.S. Naval Air Station, Floyd Bennett Field, New York. On February 26, 1952, plaintiff returned to the Shipyard with an indefinite appointment as Electrician, 1st Step. At the time of his removal from Government employment on October 8, 1954, plaintiff was a Classified Civil Service employee of the Department of the Navy.

Until the events leading to the plaintiff's discharge, his record at the Shipyard had been perfect and he had never received an unsatisfactory efficiency rating.

3. By letter of July 30, 1954, charges were preferred by the Navy against the plaintiff for "leaving assigned duties during working hours without proper permission and inducing a fellow-employee to muster out your time card." The letter contained a recital of the specific circumstances on which the charges were based, including dates, times, places, and individuals involved. The letter further informed plaintiff that—

> "(1) * * * it is proposed to remove you from employment not sooner than thirty (30) days following the date of receipt of this letter. You will be retained in a work status pending the disposition of these charges.

> "(2) You have the right to reply to this letter personally and in writing and to furnish affidavits in support of your answer, within five days of receipt of this letter.

> "(3) If you desire, you will be granted a hearing at which you may be represented by one person of your choice. You may also produce witnesses * * *."

4. The proposal to remove plaintiff from his job was preceded by a Disciplinary Report by the plaintiff's shop personnel supervisor to the Master Mechanic, which recited that the supervisor and another employee had witnessed plaintiff's fellow employee, one Rothstein, punch out the plaintiff's timecard at 4:16 p.m., on July 12, 1954. This report of July 13 was followed by a preliminary interview with Rothstein on July 14 in the Master's office. Mr. Rothstein was told by the Master that the shop personnel supervisor had submitted a Disciplinary Report stating "At approximately 1616 on July 12, 1954 Mr. Massa and myself observed Mr. Sam Rothstein punching out Harold Horn's time card. This occurred on the second floor of Building No. 275." To the Master's question as to the correctness of the report, Mr. Rothstein replied, "Mr. Musson, the report is correct. I did punch out Mr. Horn's time card yesterday afternoon." When Mr. Musson asked Rothstein whether he had been requested by Mr. Horn to punch out his timecard, Rothstein replied, "I tell you Mr. Musson, it was like this. I met Mr. Horn in the cafeteria at 1200 and he said to me 'Sam, I am going to take a powder this afternoon, and in the event that I do not get back in time will you please punch out my card?' I volunteered to punch out his card not realizing what a foolish thing I was doing. That is all, Mr. Musson."

The above interview was reported in a summary of questions and answers, was signed by four of the shop personnel present at the interview, and was included in the administrative record in this case. The document was not signed by Rothstein.

In his amended petition the plaintiff alleged that Shipyard officials, acting arbitrarily and capriciously, induced Rothstein to give false evidence against the plaintiff upon promise of benefit to Rothstein, so as to enable the latter to retain his position. The proof fails to establish this claim.

5. The plaintiff's immediate supervisor, Leadingman Randolph, by Disciplinary Report dated July 16, 1954, informed Master Musson as follows:

> "I received a report that Harold N. Horn, Electrician, 07–8564 left the Shipyard on July 12, 1954 at approximately 12:45 pm. Prior to leaving the Shipyard he requested Sam Rothstein, Pipefitter 07–35555 to muster out for him in the event he did not return in time for mustering out. Mr. Horn returned to the Shipyard at approximately 4:20 pm; however Mr. Rothstein had already mustered out for him at 4:16 pm."

6. In a letter dated July 19, 1954, to his superior, the Public Works Officer at

the Shipyard, the employee, Sam Rothstein, stated in part as follows:

> On Monday, July 12, 1954, I rang out an employee's card at 4:16 P.M. while in the presence of the employee, not realizing I was violating the rules of the yard.

> "I had done this as a mere gesture of good fellowship with no intent or motive for my act. Had I known this to be a serious crime I would not have done this under no circumstances as I had no reason for this act."

7. A preliminary hearing held in the Master's office of plaintiff's shop on July 22, 1954, was attended by the Master and five other supervisors and fellow employees of the plaintiff, in addition to the plaintiff himself. This interview was recorded in question and answer form in a Summary of Preliminary Hearing and is a typewritten document of eight pages which became a part of the administrative record. Plaintiff was advised that the hearing resulted from a report that he had left his duties and had requested Mr. Rothstein to muster out for him. In that interview Mr. Horn admitted leaving his assigned place of work in Building No. 4 in the following words: "I then went out to dinner in Building No. 14 and then I was off the job without permission. I was galavanting [sic] around the yard * * *." To this question by the Master, "Did you get permission from your supervisor to leave the job?", the plaintiff Horn replied, "No sir, I didn't." While it was not denied that Mr. Rothstein had punched out his card, Horn did deny having requested Rothstein to do so. At this preliminary hearing the immediate supervisor, Mr. Randolph, was also questioned as to plaintiff's work assignment on the day in question. He related that he discovered Mr. Horn was away from his job shortly after one o'clock in the afternoon, that he went through the entire shop looking for Mr. Horn and was unable to find him during the entire afternoon. The Master verified from the employee assigned

to work with Mr. Horn on July 12, 1954, that Horn had left the job before noon and did not return. The Master also interrogated the two individuals, Massa and Simile, who had witnessed Mr. Rothstein punching out Mr. Horn's timecard. An employee named by the plaintiff as being the only name that he could give of a number who were supposed to have seen him inside the yard on the afternoon of July 12, was questioned by the Master and stated that he had seen Mr. Horn between 2:30 and 3 p. m., in front of Building No. 5. From the record as a whole it is concluded that the plaintiff absented himself from his job without authorization, as charged, but that he did not leave the confines of the Shipyard until after quitting time.

8. Under date of July 27, 1954, the Master sent to the Public Works Officer a summary of the July 22 interview (finding 7) and a Disciplinary Report concerning plaintiff, with the following memorandum:

> "1. Enclosure (1) reports that Mr. Horn had left his assigned duties and the New York Naval Shipyard on 12 July 1954 and requested a fellow employee named Sam Rothstein, 07-35555 to muster out for him. Enclosure (1) further states that Mr. Rothstein mustered out Mr. Horn's time card on that date.

> "2. In a preliminary interview conducted on 22 July 1954, a summary of which is attached as enclosure (2) Mr. Horn denies requesting Mr. Rothstein to muster out for him. He further denies leaving the New York Naval Shipyard but admits he was 'galavanting' around the Yard from about 1245 to 1530.

> "3. It is believed that on the basis of the discrepancies of Mr. Horn's statements in comparison with other testimony given at the preliminary interview and the admission by Mr. Rothstein that he mustered out Mr. Horn's time card, at his (Horn's) request disciplinary action in this case is fully warranted.

"4. It is therefore recommended that charges leading to removal be initiated against Mr. Horn for leaving his duties without authority and for having a fellow employee muster out for him."

By first endorsement the Shops Engineer concurred in the above recommendation. The recommendation bears the penciled notation "Approved. Initiate removal proceedings as expeditiously as possible. D. 7–28–54."

9. The Public Works Officer thereafter, by letter of July 30, 1954, addressed to Harold Horn, served "Charges and notice of proposed removal for leaving assigned duties without proper permission and inducing a fellow employee to muster out your time card", as related in finding 3, supra.

Plaintiff's written request of August 2, 1954, requested that he be granted a hearing on his proposed removal.

10. On August 2, 1954, Rothstein submitted his resignation from the Shipyard. By another letter of August 2, reading in part as follows, Rothstein requested permission to withdraw the resignation:

"2. On 19 July 1954, I submitted a letter to Mr. Musson, which I requested be considered by the Public Works Officer, Commander Dodd, before he reached any decision in connection with my having punched another man's time card. At the time I submitted my resignation of 2 August 1954, I asked that the letter submitted to Mr. Musson be returned to me. I now request that that same letter be considered by the Public Works Officer as I originally intended.

"3. On 12 July 1954 while eating my lunch in Building 14 Cafeteria, I was approached by Harold Horn at about 12:05. As I recall, Harold Horn said to me that he had to go somewhere or see someone and he asked me, 'Will you check my time card in the rack for me?' Between 4:15 and 4:16 p.m., I was near the Head. I saw Harold Horn running up the steps with the other men. This reminded me to check his card as he had asked me to do. I then went to the time card rack and punched his card. I saw the Quarterman standing near the time card rack. I went to the Head and when I returned to the rack, Mr. Simile called me and brought me into the shop office where he talked to me about punching other people's cards. After I came out of the shop office, I saw Harold Horn walking through the aisle in front of the time card rack looking for his time card. When he asked the Quarterman what happened to his time card, he was told to see Simile in the morning. Right after work, I met Horn going home. I told him what happened. He said to me, 'Why did you punch my card for me? I was there. You shouldn't have punched my card for me if you saw me there.' I said I must be in trouble for doing it. I didn't think I was doing anything wrong because he asked me to do him that favor at lunch time. I didn't realize it was that big an offense. As a new man in the Yard, I am not familiar with the rules. Horn questioned me as to why I punched his card if I saw the supervisor standing in front of the time card rack. I explained that I didn't realize that I was doing anything wrong whether a supervisor was there or not. I have never punched any other man's card before and will never punch any man's card again. I am willing to recognize that I deserve some punishment, but because I am a relatively new man in the Shipyard and am not familiar with the rules, and as I have a large family with small children, I respectfully request that I be permitted to remain in the Shipyard as an employee."

Rothstein was discharged from his employment on September 10, 1954.

11. By letter of August 9, 1954, to the Public Works Officer prepared in the law office of an attorney, Sam Rothstein stated that he met Harold Horn at lunch on July 12 but now denied that Horn had told him he was leaving the shop or that Horn requested him to check his timecard. The only explanation offered for his previous statements to the contrary was that, "I first denied punching this card as I was scared and then signed the statement in my letter of Aug. 2, 1954, accusing Harold Horn of requesting me to punch his card, believing that by do so, [sic] it would help my case."

12. On August 10 and August 23, 1954, there was held a hearing in the Industrial Relations Department of the New York Naval Shipyard before Commander J. R. Newland, the hearing official designated in accordance with standard policy and procedure by the Shipyard, "to develop all the facts pertaining to the notice of proposed adverse action against Harold Horn, Electrician, Check No. 07-8564 and give Mr. Horn an opportunity to present his side of the case." Present at the hearing were representatives of the Public Works Department and plaintiff's shop and five witnesses in addition to the shop Master. Plaintiff was represented by Louis Blau, counselor at law, and plaintiff himself was present. On behalf of the plaintiff 14 exhibits were introduced and management (Navy) introduced three exhibits. The hearing held over the course of the two separate dates was transcribed verbatim and in its final form represents 88 typewritten pages. Witnesses included plaintiff's immediate supervisor, his shop foreman, the shop Master Mechanic, two fellow employees, including Rothstein and another employee. On September 23, 1954, the hearing officer reported the hearing and his findings based thereon to the Shipyard Commander. This report summarized the facts and the principal contentions in support of the charges and the principal contentions submitted in Mr. Horn's defense. With the issues so stated the hearing officer concluded that after careful consideration of all the facts and testimony presented by both sides he found that Mr. Horn had left his assigned duties without knowledge or permission, that Mr. Horn did request Mr. Rothstein to muster out for him and that the charges were therefore proven by the weight of the evidence, in view of which he recommended removal of the plaintiff from his employment.

13. The hearing officer's summary of the evidence and of the contentions of the parties is a fair one and is supported by substantial evidence, both in the administrative record and in the record before this court. There is no proof that the hearing officer was arbitrary or capricious or that he was biased, prejudiced or hostile to the plaintiff.[1]

14. By letter of October 1, 1954, from the Commander of the New York Naval Shipyard, plaintiff was advised of the final decision in his case and given notice of removal as follows:

"1. You were notified by reference (a) of your proposed removal for leaving assigned duties during working hours on 12 July 1954 without proper permission, and inducing a fellow employee to muster out your time card.

"2. At your request you were granted hearings on 10 August and 23 August 1954 to give you an opportunity to present your side of the case. After careful consideration of all the evidence submitted by you and all the facts and circumstances in your case, it has been determined that the charges, as stated above and as outlined in reference (a), are fully established and form sufficient grounds for your removal.

---

[1]. Over defendant's objections, the Commissioner permitted plaintiff to try the case *de novo*, on the plaintiff's contention that this was necessary in order to determine whether there had been any procedural irregularities or arbitrary action in the administrative proceedings.

Accordingly, your services will be terminated as of the close of business on October 8, 1954.

"3. As a veteran preference employee, you have a right to appeal your removal to the Regional Director, Second U.S. Civil Service Region, 641 Washington Street, New York 14, N.Y., within ten (10) days after the effective date of this adverse action, as provided by Section 14 of the Veterans' Preference Act of 1944, as amended. Enclosure (1) contains instructions for appeals to the Civil Service Commission. No appeal will be accepted by the Commission which is submitted after the expiration of this time limit if the delay is due to prosecuting an appeal with the Department of the Navy.

"4. As an employee of the Department of the Navy, you have a right to appeal your removal to the Assistant Secretary of the Navy for Air, via the Commander, New York Naval Shipyard, and the Bureau of Ships, within ten (10) days after the effective date of this adverse action. No appeal will be accepted by the Assistant Secretary of the Navy for Air if you elect to pursue your rights as a veteran preference employee by appealing to the Civil Service Commission."

15. Notification of personnel action form, dated October 8, 1954, notified plaintiff of his removal effective that date. Under remarks it was stated as follows:

"This action is subject to all applicable laws, rules, and regulations and may be subject to investigation and approval by the United States Civil Service Commission. The action may be corrected or canceled if not in accordance with all requirements.

"Charges were preferred against you on 30 July 1954 for leaving assigned duties during working hours on 12 July 1954 without proper permission, and inducing a fellow employee to muster out your time card. You were given an opportunity to submit any statement you desired and to request a hearing.

"At your request, you were granted hearings on 10 and 23 August 1954, at which you were given full opportunity to state your reasons why the proposed adverse action should not be taken. A review of the evidence and testimony shows that the charges against you have been sustained. Your services will, therefore, be terminated as of the close of business on the date shown in item 6 above for the reasons given in the Commander's decision dated October 1, 1954.

"Notification of lump sum annual leave due, if any, will be forwarded with your final pay check."

16. The plaintiff took an appeal to the Second United States Civil Service Region, under date of October 6, 1954. In this appeal there occurs the statement: "As regard charge No. 1, I admit I was off my assigned location for approximately 2½ hrs." Plaintiff claimed that he was going about the Shipyard for the purpose of assisting others from whom he had received materials and assistance in the past. He refused, however, to name these individuals.[2] On the second charge plaintiff denied that he had ever requested anyone at any time to ever muster out or punch his time card.

17. The Civil Service Commission, subsequent to this appeal, conducted an independent examination and investigation, which included the securing of statements in the form of affidavits of some 13 Shipyard employees. Included among these whose sworn statements were thus secured were the witnesses at the Shipyard hearing, whose statements

---

2. At trial the plaintiff established satisfactorily that he had not left the Shipyard prior to quitting time.

corroborated in substance their previous testimony.

18. On November 8, 1954, the plaintiff subscribed to the following affidavit, which was furnished to the Commission:

"State of New York ⎱
County of New York ⎰ ss:
City of New York ⎰

"I, Harold Horn, residing at 2165—64th Street, Brooklyn, New York, being duly sworn, deposes and says:

"I have reviewed the filed affidavits and materials submitted in my case to the Commission. I do not wish at this time to reply to the affidavits submitted by Management, because I wish to reserve the comments for the hearing which I am now requesting.

"Although I do not believe that the action of the Agency was taken against me because of bias or prejudice, it is my sincere belief that the information furnished to the Agency was furnished the Agency because of bias and religious prejudice.

"It is respectfully requested that the Commission submit to the Agency a formal request for the personal appearance at the hearing of the following witnesses:

"William H. Watson
"Hobert R. Randolph
"Alfred C. Musson
"Henry M. Walker
"Lester J. H. Baker
"Harold Carl
"Emil P. Delgrosso
"Vincent C. Distefano
"Floyd J. Cole

"I have been furnished with a blank copy of Form–317, which has been filled out stating that Leonard J. Meiselman is to represent me. I have executed the same and returned it to the Commission.

"This statement is not made in confidence, to the extent that the same may be used by the Commission for their purposes, and may be shown to the United States Navy Department.

"I have read the above statement, consisting of two pages, which I fully understand, and swear to its truth, accuracy and correctness."

19. By notice of hearing dated November 15, 1954, the Commission forwarded to the Shipyard the plaintiff's November 8 affidavit which requested the personal appearance of named witnesses. As to the plaintiff's request for witnesses the Commission's November 15 notice stated:

"However, since the appellant has requested their presence apparently in an effort to show that the informant had religious bias against him, this office does not concur that their presence is necessary or desirable and has so advised the appellant."

20. On November 22, 1954, a hearing was held before an appeals examiner of the Second United States Civil Service Region. Plaintiff attended in person, was represented by counsel of his choice, and brought with him some five witnesses, including Rothstein. These witnesses testified and were examined by plaintiff. Witnesses Randolph and Watson, upon whose statements the charges against plaintiff were referred, were not produced by the Shipyard at the hearing, nor did plaintiff request them directly to attend. The appeals examiner prepared a summary of the hearing, the first three paragraphs of which read as follows:

"The Hearing Examiner discussed the Commission's authority and responsibility relative to the adjudication of appeals under Section 14 of the Veterans' Preference Act and outlined the purpose and scope of the hearing scheduled at the appellant's request. During the hearing, testimony was offered by the appellant and his witnesses, as well as by the agency's representative. The oath was administered to the participants.

"Prior to the discussion of the appellant's case, the Commission's Appeals file was made available to the participants for review. The Ap-

peals Examiner explained that the hearing would be summarized and copies of the summary furnished to the appellant's attorney and the agency representative for review and comment. The appellant's attorney indicated that he had requested a transcript of the hearing which he considered was desirable in this case. The Appeals Examiner advised that, in the interest of saving time and money, the record would be summarized and the pertinent testimony would be included, as provided in the Commission's Regulations.

"Mr. Meiselman requested information as to whether or not their request for witnesses had been transmitted to the agency and he was shown a copy of the Commission's letter of November 15, 1954, addressed to the Commander, transmitting his request. Mr. Foster stated that it was the decision of the agency not to take any action to arrange for the presence of these witnesses. Mr. Meiselman requested that the record show that the agency failed to produce the witnesses requested, stating that this was a further indication of the bias shown toward the appellant. Mr. Foster stated that it was the agency's feeling that the appellant had been given a full hearing, at which he was represented by an attorney and given opportunity of calling any desired witnesses; that the appellant did produce some witnesses at that hearing; and that the agency considered the record complete. He stated that the agency did not consider it necessary or economical to bring any witnesses to the Commission hearing."

21. Mr. Rothstein at the regional hearing admitted punching out plaintiff's timecard but denied that he had done so at the plaintiff's request. The plaintiff also admitted being away from his assigned duties on the day in question but denied requesting anyone to punch out his timecard. The summary of the hearing is in evidence and consists of 15 single-spaced typewritten pages. Following the hearing copies of the summary were submitted to the parties. Mr. Meiselman, attorney for plaintiff, requested certain changes in the summary by letter of November 24, 1954, and declared that "in all other respects the undersigned believes that the summary is true and correct." The requested changes were made, and after submission to the Shipyard representative, that individual indicated approval of the summary by his signature at the end thereof.

22. The Regional Director of the Second Civil Service Region advised the Shipyard that the Agency action was sustained, based on his summary and analysis of the evidence, findings and recommendations, which concludes—

"It is the finding of this office, based on all of the evidence of record, that the charges have been sustained by the evidence and the appellant's removal from the service was properly taken and is considered to be for such cause as will promote the efficiency of the service within the meaning of the language of Section 14 of the Veterans' Preference Act. No change is recommended, therefore, in the personnel action from which this appeal was taken."

23. On December 10, 1954, the plaintiff appealed to the Commission's Board of Appeals and Review, requesting in the alternative a hearing or a reversal of the action of the Second Region. On January 18, 1955, the Board of Appeals and Review rejected plaintiff's request for a hearing, and assured plaintiff that it would give careful consideration to the facts in the case. On May 5, 1955, the Board of Appeals and Review affirmed the action of the Second Region and concluded that the personnel action had been procedurally valid.

24. The finding of the Regional Director is supported by substantial evi-

dence. There is no evidence that representatives or officers of the Civil Service Commission were arbitrary or capricious in their handling of plaintiff's appeal.

25. The Standard Schedule of Disciplinary Offenses and Penalties for Civilian Employees in Naval Establishments provides:

| "Offense | Penalty Range |
|---|---|
| " 7. Leaving job to which assigned or Navy premises at any time during working hours without proper permission. | 1st: Warning to 5 days. 2nd: 3 to 10 days. 3rd: 10 days to removal. |
| "30. Falsifying attendance record for oneself or another employee. | 1st: Warning to removal. 2nd: 15 days to removal. 3rd: Removal." |

The schedule is conspicuously posted in all shops. The schedule also provides the following:

"Deviation from Penalty Range: Penalties for disciplinary offenses will in general, fall within the ranges indicated. In unusual or exceptional circumstances, depending on the severity of the infraction and the past record of the employee, greater or lesser penalties than those indicated above may be invoked or recommended by the Department Head."

The schedule further provides:

"Other Offenses: The above list is not intended to cover every possible type of disciplinary infraction. Penalties for offenses not listed will be prescribed consistent with penalties for comparable offenses."

26. The following regulations of the New York Naval Shipyard as to procedural requirements for disciplinary and other adverse actions were applicable at relevant times:

"Shipyard Manual Article No. IV-9-a

"Section IV—Personnel

"Sub-Section 9—Rating and discipline

"Article a—Disciplinary and other adverse actions

\* \* \* \* \* \*

"2. *Purpose.* The purpose of this article is to outline procedural instructions relating to disciplinary and other adverse actions. \* \* \*

"3. *Responsibility of the Industrial Relations Officer.* The Industrial Relations Officer and his staff are available for advice and assistance to all levels of supervision. The function of the Industrial Relations Department in disciplinary actions is purely advisory. A copy of each disciplinary action (together with the hearing record) shall be forwarded to the Industrial Relations Department. The Industrial Relations Officer is responsible for review of all disciplinary actions taken or recommended to see that they conform to prescribed policies, regulations and procedures. If, upon review, he determines that further consideration is necessary or desirable, he shall return the case to the head of department or office with his comments. If the department or office head and the Industrial Relations Officer cannot agree upon the correctness of the action recommended or taken, the case shall be referred to the Commander for decision.

"4. *Disciplinary Report.* Civilian supervisors shall use the Disciplinary Report Form 3ND–NYNS–GEN–109 (Report Symbol NYNS–COM–32) to report delinquency, misconduct, or unsatisfactory work

performance. The disciplinary report shall be submitted to the shop master or senior civilian supervisor via channels.

"5. *Preliminary Interview.* A preliminary interview shall be held by the shop master or senior civilian supervisor or a designated line supervisor prior to the actual preferral of charges. At the conclusion of the interview, the shop master or senior civilian supervisor shall personally decide whether or not charges are warranted. The employee against whom the report is made and the complainant shall be present at the interview, if possible.

\*  \*  \*  \*  \*  \*

"11. *Demotions, Removals, or Suspensions in Excess of 30 Calendar Days of Employees Who Have Completed Their Trial Period.* Whenever it is proposed to demote, remove or suspend an employee in excess of 30 calendar days who has completed his trial period, the following procedure shall be used:

"a. *Recommendation of Shop Master or Senior Civilian Supervisor.* The shop master or senior civilian supervisor shall first hold an informal discussion with the employee (if possible), advising him of the specific instance of misconduct, dereliction of duty or unsatisfactory work performance. The employee will be permitted to reply and present his side of the case. The brief summary of the statements made by management officials and the employee shall be filed in the shop or office and a copy given the employee upon request. If demotion, removal or suspension for more than 30 calendar days is considered warranted, the recommendation, the reasons therefor and the summary of the discussion shall be forwarded to the head of department or office.

"b. *Charges.* If the head of department or office concurs in the recommendation, he will prefer charges in accordance with the provisions of NCPI 45.5–4(b). A copy of the charges shall be sent to the Industrial Relations Department.

\*  \*  \*  \*  \*

"d. *Hearings.* When an employee requests a hearing, the entire case file and the employee's reply shall be forwarded to the Industrial Relations Department for scheduling of a hearing in accordance with paragraph 14.

"e. *Final Decision.* After each hearing conducted in accordance with these instructions, the hearing official shall prepare a report of findings and recommendations. This report shall be processed as follows:

"(1) If the hearing official finds that the charges have been sustained and concurs in the proposed adverse action, his report shall be addressed to the Shipyard Commander and delivered to Code 150 for further processing. If the Industrial Relations Officer concurs, he will prepare a notice of decision for the Commander's signature.

\*  \*  \*  \*  \*  \*

"14. *Hearings.* NCPI 45.5–7 sets forth the purpose and rules governing administrative hearings incident to proposed adverse actions.

"a. *Actions Which Must Be Approved by the Commander.* The Chairman of the Grievance Advisory Committee and his alternates shall serve as hearing officials in all cases involving a proposed adverse action which must be approved by the Commander. The Industrial Relations Officer shall designate a hearing official for each case scheduled to be heard. No officer shall be assigned to conduct a hearing involving an employee from his own department or office. The In-

dustrial Relations Officer or his designated representative shall serve as recorder for the hearing official. The hearing official's report of findings and recommendations shall be processed in accordance with paragraphs 11e or 12c.

\* \* \* \* \* \*

"d. *Duties of Recorder.* The recorder shall schedule the time and place of each hearing involving a proposed adverse action which must be approved by the Commander. He shall assemble all pertinent documents in the case; provide needed clerical and typing assistance; furnish advice and assistance at hearings; and record the hearing officer's findings and recommendations. He shall also perform other related duties as the hearing officer may direct and may take part in the discussion of the case at the discretion of the hearing officer. However, the hearing officer, as the Commander's representative, is responsible for the conduct of the hearing and submission of his findings and recommendations.

"e. *Hearing Record.* Hearings conducted in accordance with the procedures outlined in paragraphs 11 and 12 shall be recorded verbatim on mechanical recording equipment. All other hearings may be recorded verbatim or by a summary of each person's statements. The employee or his representative shall be given a copy of the hearing record.

\* \* \* \* \* \*

"17. *Appeals.* All appeals from disciplinary actions shall be forwarded to the Industrial Relations Officer via the head of department or office concerned for processing in accordance with NCPI 45.5–3d, NCPI 45.5–4d or NCPI 45.5–8."

27. a. Mr. A. C. Musson was the Master Mechanic in charge of Shop 07 in which plaintiff was employed. As the Master he was in direct charge of the maintenance shop in which all repairs and some new work were done for the Shipyard. There were about 2,000 civilians employed in the shop in 1954. Under the Master were various supervisors and foremen, including quartermen and leading men. The Master had to coordinate the work and to see that everyone was skillfully employed.

b. The Master testified that for some time prior to the events here involved he had grown concerned because of the frequency with which he had observed one or more members of his shop, including plaintiff, away from their assigned duties and apparently unoccupied. Plaintiff, in turn, repeatedly in the administrative proceedings as well as in this proceeding, has spoken of frequently being away from his assigned jobs without permission prior to the instant occurrence.

c. Musson had been a Master since 1942. He had been in the employment of the Navy for some time prior thereto. Musson did not personally know all the individual employees but in this case he did know the plaintiff and had been instrumental in helping him to obtain employment in the Shipyard since he was recommended by Musson's brother-in-law. There was no animosity, hostility, nor any feeling of ill will between plaintiff and the Master. Furthermore, there was no friction of any kind between the Master and Rothstein. Musson originally took action in this case upon a report furnished by the plaintiff's leading man, a Mr. Randolph. The Master had never had occasion to question Randolph's veracity or honesty and had never received any false reports from Randolph. The Master was an able and experienced supervisor and was entitled to rely upon the reports of his subordinates in this case.

28. Harry Simile was the Shop Personnel Supervisor in the office of the Master. He also furnished a written report to the Master stating that he and another employee, one Massa, had ob-

served Rothstein punching out the plaintiff's timecard on July 12, 1954. There was no ill will, hostility, or friction between Simile, Horn and Rothstein.

29. Hobert Randolph was the plaintiff's leading man and immediate supervisor. He was present at the preliminary interview held in the Master's office on July 14, 1954, at which time Rothstein told the Master that Simile's report was correct and that he did punch out Mr. Horn's timecard. At this same interview Rothstein told the Master that he had done so at plaintiff's request. Randolph was never directly requested by plaintiff or anybody on the plaintiff's behalf to be a witness at the Civil Service Commission Regional Hearing, but he did testify at the Agency hearings. There was no hostility or ill will between Randolph, plaintiff, and Rothstein.

30. Due to the inconsistent statements by plaintiff's friend and alleged co-conspirator, Rothstein, his protestations and explanations attempting to remove the effect of certain verbal and written admissions made by him are entitled to little weight and the administrative decisions so holding are not clearly arbitrary, capricious or erroneous.

31. With reference to the allegations of possible procedural irregularities in this case, the decision to remove the plaintiff from his employment was arrived at after substantial compliance with the Navy's regulations and those of the Civil Service Commission. The decision was based upon extensive and substantial evidence in the administrative record which had been carefully considered both at the Agency level and by the Civil Service Commission's Regional and Appeals Boards. There is no evidence in this case that the action taken against the plaintiff by the Navy and affirmed by the Civil Service Commission was either arbitrary or capricious.

## Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is dismissed.