Edward J. SULLIVAN and Elwood V. Wilson

v.

The UNITED STATES.

No. 290–63.

United States Court of Claims.

Oct. 17, 1969.

William E. Cleaves, Memphis, Tenn., attorney of record, for plaintiffs. Cleaves & White, of counsel.

George M. Beasley, III, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

**PER CURIAM:**

This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law under the order of reference and a further order of May 15, 1967. The commissioner has done so in an opinion (supplemental) and report filed on June 5, 1969. Plaintiffs have filed no notice of intention to except nor exceptions to the opinion and report and the time for so filing under the rules of the court has expired. On July 25, 1969, defendant filed a motion requesting that the court adopt the commissioner's report and opinion with a suggested modification by way of a deletion in the recommended opinion. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, with modifications, as hereinafter set forth,

it hereby adopts the same, as modified, as the basis for its judgment in this case without oral argument. Therefore, plaintiffs are not entitled to recover and their petition is dismissed.

Commissioner Bennett's opinion (supplemental*), as modified by the court, is as follows:

Subsequent to the oral arguments presented on May 3, 1967, the court, on May 15, 1967, granted the defendant's motion to reopen proof, and remanded this civilian pay case to the commissioner to receive additional evidence. The case had initially been considered on a stipulation and the administrative record by agreement of the parties. By order of the commissioner under Rule 43(e), on June 13, 1967, additional proof was to be limited to the eight new issues raised by the defendant in its motion to the court. Thereafter, on March 4 and 5, 1968, in Washington, D. C., and on March 11, 1968, in Memphis, Tennessee, the parties presented evidence at trial as to these issues.

The original report in this case was filed on January 21, 1966. To the extent pertinent to this supplemental opinion, the commissioner held that the policy of the Federal Aviation Agency,[1] requiring GS-8 assistant air traffic controllers to qualify under training for GS-10 journeyman air traffic controller positions, violated the Classification Act of 1949, 5 U.S.C. § 5101 et seq. (Supp. IV, 1965-68). The defendant excepted to this conclusion, and, since the validity of the Agency policy under the Act had not been questioned by the parties in their pleadings and briefs, motioned to reopen proof.

Proof was received regarding, *inter alia*, the details of plaintiffs' duties as assistant air traffic controllers; their actual training under the FAA program; the duties and responsibilities of grade-6 ("trainees") and grade-10 ("journeymen") air traffic control specialists (center); the various employees included within the scope of the training program; the peculiar needs of the FAA for the training of air traffic control specialists; the range of tasks, assignments, and skills included within the training program; and the time plaintiffs devoted to training and to their other duties. On the basis of such proof, it is concluded that the FAA policy was not inconsistent with the Classification Act.

Since the mid-1940's, the FAA (or a predecessor) has had a sophisticated training program, designed in the main to train journeymen air traffic controllers. At the time plaintiffs commenced their employment for the FAA, trainees were taken on as GS-6 airways operations control specialists (center),[2] given a 4-to-8-week "indoctrination" course in air traffic control fundamentals at the FAA Academy in Oklahoma City (or occasionally at other FAA installations), examined, certificated (Airways Operations Specialist Certificate), and assigned to an FAA air route traffic control center for approximately 6 months of on-the-job training. Thereafter, the trainees' performance was evaluated by supervising assistant and journeymen air traffic controllers and, if satisfactory, they were assigned positions as GS-8 assistant air traffic controllers.

The new assistant air traffic controllers then underwent approximately 6 months of on-the-job training, under the direct supervision of journeymen controllers. The journeymen continually evaluated their assistants' performance and, if satisfactory, they were selected for "up-grade training."

* The supplemental opinion, findings of fact, and conclusion of law are submitted under the order of the court dated May 15, 1967. The original report is withdrawn.

1. Hereafter, the employing agency is referred to as the FAA or simply as the Agency. Similarly, the United States Civil Service Commission will sometimes be referred to as the Commission.

2. The terms airways operations control specialist, air traffic control specialist, and air traffic controller are used interchangeably.

Generally, up-grade training began with approximately 2 weeks of classroom instruction and laboratory work, during which simple control problems were set up. This was followed by approximately 2 weeks of additional, more difficult classroom and laboratory work. At this point, trainees whose performance was satisfactory were required to demonstrate their ability to control heavy simulated air traffic in the laboratory. Trainees who succeeded in doing this were then given additional on-the-job training, which included the supervised control of "live" air traffic.

Thereafter, trainees who were certified by their supervising journeymen to be ready to control traffic independently were assigned positions as acting air traffic controllers. Such acting controllers were closely observed for approximately 30 days; and, if their performance continued satisfactorily they were appointed to journeymen air traffic controller positions, at grade 10, when vacancies arose.

■ It was plaintiffs' failure to complete up-grade training successfully which led to their dismissal by the FAA. They exhausted their administrative remedies. The Board of Appeals and Review of the Civil Service Commission in April 1962 refused to grant them any relief. Plaintiffs claim denial of due process and of their procedural rights in refusal of the Commission to permit a court reporter to make a verbatim transcript of their hearings so that it would be available for judicial review. The same argument was made but rejected by the court in Horn v. United States, 177 F.Supp. 438, 147 Ct.Cl. 234 (1959). The same reasons for rejection exists here: (a) the Commission's regulations, 5 C.F.R. § 22.605 (1961), do not require a verbatim tran-

script; (b) the summary of the proceedings prepared by the hearing officer appears comprehensive as to all testimony elicited and arguments made; and (c) an opportunity was afforded both the plaintiffs and the Agency representatives to criticize in writing the prepared summaries with the advice that the criticisms of both sides would then form a part of the record, which they now do. Thus, it does not appear that plaintiffs' constitutional or statutory rights [3] were violated by the procedure utilized.

The determinative issue in this case, it now appears, involves the proper characterization of the GS-8 assistant air traffic controller position. Section 5101, title 5 of the United States Code (Supp. IV, 1965–68),[4] in pertinent part, provides:

It is the purpose of this chapter to provide a plan for classification of positions whereby—

(1) in determining the rate of basic pay which an employee will receive—

(A) the principle of equal pay for substantially equal work will be followed; and

(B) variations in rates of basic pay paid to different employees will be in proportion to substantial differences in the difficulty, responsibility, and qualification requirements of the work performed and to the contributions of employees to efficiency and economy in the service; and

(2) individual positions will, in accordance with their duties, responsibilities, and qualification requirements, be so grouped and identified by classes and grades, * * *.

---

3. As veterans, plaintiffs are entitled to the procedures in dismissal of preference eligible provided for by the Veterans' Preference Act of 1944, ch. 287, § 14,

58 Stat. 390; 5 U.S.C. §§ 851, 863 (1958).

4. Formerly 5 U.S.C. § 1071 (1964).

Section 5106, title 5 of the United States Code (Supp. IV, 1965–68),[5] in pertinent part, states:

(a) Each position shall be placed in its appropriate class. The basis for determining the appropriate class is the duties and responsibilities of· the position and the qualifications required by the duties and responsibilities.

(b) Each class shall be placed in its appropriate grade. The basis for determining the appropriate grade is the level of difficulty, responsibility, and qualification requirements of the work of the class.

If, as the defendant contends, the primary duty of the assistant air traffic controller was to assimilate the skills of the grade–10 journeyman, the statute will not have been violated. It is not inconsistent with the Act to require a *trainee* to qualify and perform the duties of the higher level position for which he is training; and the trainee's lower grade level, even after so qualifying, is justified by the fact that his responsibilities, pending appointment, are fewer than those of the higher level position. If, on the other hand, as plaintiffs contend, the assistant's position was a *nontraining* one, the statute will have been violated; for, in such case, the assistant's grade level will have been determined not by the duties and responsibilities of that position, but by those attendant to another and higher position.

The reopened proof sheds some light on the FAA training program, its history, operation, and goals. It appears that since taking over the operations of the three then-existing air traffic control centers in 1936, the FAA (or a predecessor) has been the only civilian employer of air traffic controllers in the United States; that, because of this, the Agency has had to rely largely on its training program to meet its controller needs; and that, accordingly, as indicated earlier, the Agency training program is designed to produce fully qualified journeymen air traffic controllers.

The training of appointees in grades GS–5 and GS–6 is facilitated and governed by a Training Agreement of the FAA, approved by the Civil Service Commission. This agreement provides for promotion of trainees more rapidly than otherwise permitted by Commission regulations and job standards.

The details of the training program, as affecting plaintiffs, are outlined above. Not indicated earlier, however, is the fact that while partaking of "on-the-job" training, grade–8 assistant air traffic controllers (and, to a lesser extent, grade–6 trainees) perform a variety of useful services for the Agency. These essentially clerical tasks are indicated in the Civil Service Commission job standards for the grade–8 specialist (center) position, reprinted in the findings. Added to that list is the requirement, applicable to specialists of every grade, that assistance be rendered in the training of lower grade employees. *See* finding 38(b). It is because assistants perform such tasks and because, unlike grade–6 specialists (center) they were not referred to as "trainees" and to plaintiffs' belief were vitally needed by the Agency (journeymen, of course, are capable of performing these services, but the press of traffic generally precludes their doing so), that plaintiffs contend the assistant's position was a nontraining one. Plaintiffs also cite the Agency announcement for GS–5 and GS–6 specialist positions as evidence of the Agency's view that only such positions were primarily for training.

■ It is true, as plaintiffs contend, that the assistant's services were useful and that, notwithstanding the training program, someone would have to be employed to perform such tasks. However, as defendant proves, the performance of such services was itself a form of training and, in the case of the grade–8 assistants, a necessary prerequisite to participation in the formal up-grade training program. Moreover, while assistants were not referred to as

5. Formerly 5 U.S.C. § 1092 (1964).

"trainees" by the Agency (while in on-the-job training), they were considered by it as such, and there is nothing in the announcements for GS–5 and GS–6 specialists suggesting how the Agency viewed its grade–8 specialist (center) positions.

It is unnecessary to belabor this point. That one performs useful services while in training is not per se inconsistent with his training status; many tasks one simply learns by doing. Agency titles also should not be relied on. Surely there is no hard-and-fast rule that all Government employees participating in training programs be designated or referred to as "trainees." As a matter of fact, the Civil Service Commission which, in accordance with the Classification Act, 5 U.S.C. § 5105 (Supp. IV, 1965–68), develops, with agency assistance, job standards for all Government positions covered by the Act (including training and excepted-service positions), no longer designates holders of training positions as "trainees"; instead, the standards for such positions describe the training nature of the work.[6] See 5 U.S.C. 5105(c) (Supp. IV, 1965–68).

 The Commission job standards for air traffic control specialist (center) positions are informative.[7] In paragraphs describing the "nature and variety" of specialists' work, the standards indicate that training is an integral part of the grades–6 and –8 specialists' duties; there is no mention of training, however, with respect to grade–10's (journeymen). "Incumbents of [grade–6] positions," the standards note, "receive training and acquire competence in the performance of flight data duties," the essentially clerical work-product of assistant controllers; grade–8 "positions * * * are characterized by (a) performing flight data duties * * *, and (b) receiving training, in, and ac-

quiring competence in, the performance of manual or interphone sector control duties." Among other qualifications, another paragraph of the standards states, grade–8 specialists (center) must also have the "ability to learn sector control duties". With respect to grade–10 specialists (center), the standards provide:

> * * * positions of this class are characterized by responsibility for performance of control duties on sectors requiring no more than one control position or performance of duties of the manual or interphone control position on sectors requiring more than one position of operation.

Similarly, the standards indicate that "the *principal differences* [emphasis in original] between [grade–8 and grade–6 specialist (center)] positions * * * are the requirements for independent performance of flight data duties, for thorough knowledge of local procedures and features, and *for receiving training in sector control duties.*" [Emphasis added.] "*The principal difference* [emphasis in original] between [grade–10 and grade–8 specialist (center)] positions * * * is the responsibility for independent control of air traffic."

Finally, it is noteworthy that Mr. Donald R. McPherron, Assistant Chief, Standards Division, Bureau of Policies and Standards of the Commission, in unrebutted testimony, stated that the Commission regarded the grade–8 specialist (center) position as a *training* position, "the basic requirement" of which was "to learn and to absorb training." According to Mr. McPherron the standards were written to reflect this view.

 It is accordingly concluded that the grade–8 airways operations specialist (center) position was in fact a training position, the intermediate po-

---

6. The Commission standards do not include the Agency titles for the grades–6, –8 and –10 trainee, assistant air traffic controller, and journeymen air traffic controller positions. All are described as air traffic control specialists (center).

7. For the complete text of the standards for grades–6, –8, and –10, specialists (center), see finding 8.

sition in the three-step, unavoidably complex FAA controller training program. With this conclusion, as indicated earlier, the policy of the FAA, requiring GS–8 assistant air traffic controllers to qualify under training for GS–10 journeymen air traffic controller positions, and plaintiffs' dismissal by that Agency for failure to do so, cannot be held to have been inconsistent with the Classification Act. Whether it is proper to measure a Government employee's performance by the degree to which he has learned the skills of the next higher position depends upon whether he has been hired as a trainee whose primary duties are to learn such skills, or as a journeyman. As defendant succinctly states it, "a distinction may validly be made between Government employees who have been *employed in order to learn* (such as plaintiffs) and those who have *learned in order to be employed* at a certain level (such as the ordinary non-trainee)."

■ It now need only be noted that plaintiffs' dismissal also did not infringe their rights under the Civil Service Commission regulations setting up a probationary period after which plaintiffs were entitled to be free from further examination of their qualifications, 5 C.F.R. §§ 315.801–.807 (1969), since such regulations, which were designed to afford the Government a limited period during which it might peremptorily dismiss new employees, were not intended to preclude a post-probationary dismissal for failure to complete successfully up-grade training where such requirement has a direct bearing on promoting "the efficiency of the service," 5 C.F.R. § 752.104 (1969). *See* Preble v. United States, 150 Ct.Cl. 39, 43 (1960).

*See also* Burkett v. United States, 402 F.2d 1002, 1004, 185 Ct.Cl. 631, 634–635 (1968); Greenway v. United States, 175 Ct.Cl. 350 (1966), cert. denied, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108; Meyers v. United States, 169 Ct.Cl. 1, 6 (1965).

■ The adverse decision of the Civil Service Commission must be and it is upheld as to plaintiffs' claims for alleged illegal dismissal. Plaintiffs have not established that the Commission erred or abused its discretion in upholding the FAA's decision that their dismissal promoted the efficiency of the service nor have they proved that any of their procedural or statutory rights were violated either by the FAA or by the Commission. Absent such a showing, the administrative decision will not be disturbed by the court. This is so well established as to require no citation of authority.

To the above, this caveat is added: this opinion necessarily deals only with the unusual, Commission-approved program whereby the Agency trains journeymen controllers; more particularly, with the GS–8 airways operations specialist (center) position. It must be made clear that there is no intent to adversely affect the tenure rights of employees with permanent status in the classified competitive Civil Service, even though they may not have qualified for their superiors' jobs.

Finally, defendant contends that the doctrine of laches bars the prosecution of plaintiffs' claims because they delayed about 18 months after adverse Commission action before filing their claims with the court. In light of the conclusions above, however, this contention need not be reached.