Arlington Bowling Corporation v. Commissioner.
Arlington Bowling Corp. v. Commissioner
Docket No. 77184.
United States Tax Court
T.C. Memo 1959-201; 1959 Tax Ct. Memo LEXIS 47; 18 T.C.M. (CCH) 896; T.C.M. (RIA) 59201; October 26, 1959
*47 Cost of stock in a bowling pin manufacturing corporation bought by petitioner, an operator of bowling alleys, in 1950 to insure it of a source of supply of pins at a time when it was difficult for petitioner to secure pins, held deductible in full in 1955 as a business expense or loss upon worthlessness of the stock and a failure of the manufacturer to supply the pins. Tulane Hardwood Lumber Co., 24 T.C. 1146, followed. Lipman Redman, Esq., Ring Building, Washington, D.C., for the petitioner. Kenneth G. Anderson, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined a deficiency in income tax for the calendar year 1955 of $2,005.49. The only issue is whether the respondent erred in disallowing a deduction claimed by petitioner in its 1955 return of $10,130. Findings of Fact Some of the facts were stipulated and they are so found. Petitioner is a corporation with its principal office in Arlington, Virginia. It filed its United States corporation income tax return for the calendar year 1955 with the district director of internal revenue for the district of Richmond, Virginia. On its return for 1955, petitioner deducted the *48 amount of $10,130 as a "Loss on investment to procure bowling alley pins." The respondent disallowed the claimed loss and, in a statement attached to the deficiency notice, he explained the disallowance as follows: "It is held that the loss realized during the year 1955 from the worthlessness of stock of Eagle Lake Lumber Mills, Inc. is a capital loss rather than an ordinary loss as reported in your Federal income tax return for the year 1955." Petitioner was incorporated in 1940 under the laws of the Commonwealth of Virginia for the purpose of conducting the business of operating a duck pin bowling center consisting of 32 bowling lanes. By 1950 petitioner had been experiencing increasing difficulty in securing an adequate supply of duck pins of good quality. This shortage required petitioner to continue to use duck pins in its bowling center longer than it normally would, which was very unsatisfactory to its customers. As this shortage of quality duck pins continued and increased, the manufacturers of bowling pins placed petitioner on an unsatisfactory allotment basis and gradually increased the price of pins, thereby aggravating petitioner's problem of conducting its bowling business. *49 This same shortage of quality duck pins and the corresponding increase in price for those duck pins which were available applied not only to petitioner but also to other bowling center operators in the area. In 1950, petitioner learned of plans to organize a new corporation for the purpose of engaging in the business of manufacturing bowling pins by a new process known as the laminated edge grain process. This process was supposed to make a higher quality pin in terms of the important considerations of durability and scoring ability. The proposed new corporation was having difficulty raising necessary funds to organize and operate its new business. It had to raise additional funds in order to qualify for a loan from the Reconstruction Finance Corporation (RFC). The promoter and president of the proposed new corporation, Russell L. Diehl, offered to guarantee petitioner a constant supply of quality duck pins at a 25 per cent reduction in the market price if petitioner purchased stock in the proposed new corporation. The name of the new corporation was to be Eagle Lake Lumber Mills, Inc., hereinafter sometimes referred to as Eagle Lake. Petitioner's president discussed the proposal *50 with two other bowling center operators in petitioner's area, one of whom had been previously associated with Diehl in connection with the laminated edge grain bowling pin. Petitioner's president told these other two bowling center operators of the proposal offered petitioner by Eagle Lake's president for a constant source of supply of quality duck pins at a substantial price saving. In September 1950 petitioner agreed to buy $10,000 worth of stock in Eagle Lake provided that corporation was able to raise the required amount from other sources and to secure the required loan from the RFC. Accordingly, petitioner's check dated September 8, 1950, made payable to Eagle Lake, was placed in escrow with the Arlington Trust Company, Arlington, Virginia, along with $15,000 from the other two bowling center operators, and $5,000 from a local jobber. This subscription to $30,000 worth of stock was on the basis of the understanding that the parties would receive priority in duck pins. This understanding was confirmed at the first meeting of Eagle Lake's directors. The total escrow of $30,000 was released in March 1951, and the physical issuance of stock certificates in Eagle Lake to petitioner *51 took place at around that time. In August 1952, Eagle Lake issued an additional $130 worth of stock to petitioner in payment of an obligation of that amount. Under petitioner's arrangement with Eagle Lake and on the basis of the proposed operations of Eagle Lake, petitioner and the other bowling alley operators who purchased stock in Eagle Lake were supposed to start receiving duck pins from Eagle Lake in September 1951, that time being the beginning of the first bowling season following the release of the escrow. Petitioner's sole interest in buying and holding stock in Eagle Lake was to solve the then increasingly serious shortage of quality duck pins. This was petitioner's sole concern at the time of purchase of stock in Eagle Lake and at all times thereafter. Petitioner did not give any consideration to any long-range aspects of the purchase, such consideration being unnecessary because petitioner's sole concern was to solve the then immediate and increasing shortage of quality duck pins. The various activities of petitioner's president, in connection with the business of Eagle Lake, were all designed to satisfy petitioner that the proposed new corporation could produce duck pins *52 and thus solve the duck pin shortage. Eagle Lake was not able to deliver duck pins until 1953 to petitioner or the other stockholders who were bowling alley operators because of Eagle Lake's numerous financial and production difficulties, including a disastrous fire that destroyed the boiler room, and the necessity of first producing ten pins which generated a higher profit and for which orders had been received with amounts paid in advance. The greater percentage of the country bowls ten pins rather than duck pins. Petitioner and the other bowling alley operators who had purchased stock in Eagle Lake went along with this delay despite the understanding that they would be supplied with duck pins from the beginning. Eagle Lake had a sales subsidiary called Mapledge Corp. During the years 1953 through 1955, petitioner received the following number of duck pin sets from Eagle Lake and/or Mapledge Corp. at the following costs: Year
Sets
Cost
1953
142
$1,224.54
1954
886
5,828.48
1955
270
2,052.00
Petitioner received these duck pins by virtue of its status as a stockholder in Eagle Lake. The other bowling alley operators who were also stockholders in Eagle Lake also received duck pins from Eagle Lake *53 by virtue of their status as stockholders. The prices petitioner paid for duck pins received from Eagle Lake were substantially below the average prices petitioner was paying to its regular suppliers. Petitioner continued to secure duck pins from its regular suppliers because Eagle Lake had not demonstrated its ability to produce enough duck pins to solve the shortage and it was important for petitioner to maintain its contacts with its other suppliers. Eagle Lake stopped production early in 1955. Its secured creditors levied attachments on all the corporation's assets in the summer of 1955, and the corporation went into receivership in 1955. By December 31, 1955, petitioner's stock in Eagle Lake was worthless. Petitioner made no effort to sell its stock in Eagle Lake because there was no market for the stock at any time between the time petitioner acquired it and the time it became worthless in 1955. At the time petitioner purchased the stock in Eagle Lake, petitioner had not made any investment in any business other than its own business of operating a bowling alley. In 1953, petitioner deposited $10,000 in the First Building & Loan Association of Arlington, Virginia. This amount *54 continued on deposit until 1958. In June 1954, petitioner lent $30,888.31 to Tele-ception, Inc., of Middlesboro, Kentucky. As a bonus for making this loan, petitioner received 500 shares of the capital stock of that corporation. In August 1954, petitioner purchased $10,000 worth of 7 per cent 10-year debentures issued by Entron, Inc. As a bonus for purchasing these debentures, petitioner received 200 shares of the capital stock of that corporation. On its Federal income tax returns for the years 1950 through 1954, petitioner listed its ownership of stock in Eagle Lake as an "investment" under Item 7, "Other Assets." Petitioner did not purchase the stock in Eagle Lake as an investment. Petitioner did not hold the stock in Eagle Lake as an investment. Opinion On the basis of our finding that petitioner's sole concern at the time of purchasing the Eagle Lake stock was to solve the then increasingly serious shortage of quality duck pins, we hold that petitioner is entitled to deduct in 1955 the cost of the stock either as a business expense under section 162(a), [1] I.R.C. 1954, or as a loss under section 165(a). [2] Such a finding does not support the respondent's contention that the loss *55 sustained on the worthlessness of the stock in 1955 is deductible only under section 165(g) [3] as limited by section 1211 [4] *57 for the reason that the stock was a "capital asset" as that term is defined in section 1221 [5] of the 1954 Code. The loss here arose from the everyday operation of petitioner's business and as such is deductible in full either as an ordinary and necessary business expense or as a business loss. Corn Products Refining Co. v. Commissioner, 350 U.S. 46, affirming C.A. 2 (215 F. 2d 513), and indirectly our decisions at 16 T.C. 395 and 20 T.C. 503; Western Wine & Liquor Co., 18 T.C. 1090; Charles A. Clark, 19 T.C. 48; Bagley & Sewall Co., 20 T.C. 983, affirmed by C.A. 2 (221 F. 2d 944); Tulane Hardwood Lumber Co., 24 T.C. 1146. The taxpayer in the Tulane case sold lumber and plywood at wholesale. It lost its source of plywood purchases. In 1945, it contacted the organizers of a new company, Tidewater Plywood Co. Tidewater reserved $10,000 of its debentures for sale to the taxpayer and agreed to allocate to the taxpayer a portion of its plywood production. In 1946, Tulane purchased the debentures for $10,000 and treated the purchase as an investment on its income *56 tax returns. The debentures became worthless in 1950. In holding that Tulane was entitled to deduct the full cost of the debentures as a business expense or loss in 1950, we said: "Petitioner's action in purchasing the debenture was a reasonable and necessary act in the conduct of its business. The loss of the purchase price was proximately related to that acquisition. Hence under section 23 the amount was a deductible business expense, or business loss, properly taken in the instant year since that was the first time the reason for holding the debenture disappeared and the extent of the loss could be accurately measured." We see no difference in principle between the facts in Tulane and the facts in the instant case. In our opinion, it is immaterial that Eagle Lake sold the pins to petitioner at a reduction from the market price. That was merely *58 incidental to petitioner's main purpose of obtaining a new source of supply of quality duck pins needed in its business. Neither does the fact that petitioner in 1953 and 1954 made investments in other enterprises affect the status of the acquisition of the Eagle Lake stock which was made for the purpose of keeping petitioner in the bowling alley business. The fact petitioner listed the ownership of its Eagle Lake stock in its returns as an "investment" is of little consequence. The taxpayer in the Tulane case did likewise and the Supreme Court in the Corn Products case did not regard the label given as controlling. The case of Gulftex Drug Co., 29 T.C. 118, relied upon by respondent, is distinguishable upon its facts. In that case the taxpayer had purchased some stock in order to obtain certain rights to purchase whiskey but continued to hold the stock for several years after it had fully exercised those rights and later sold the stock at a loss. There we held that the stock was a capital asset at the time of sale and a long-term capital loss resulted. That is clearly not the situation here. Petitioner, in the instant case, bought the Eagle Lake stock for the sole purpose of the *59 privileges attached to it of being assured of obtaining a steady source of supply of quality duck pins. This was the original purpose; it continued as the sole purpose up to the time the stock became worthless. We hold petitioner is entitled to the deduction as claimed. Decision will be entered for the petitioner. Footnotes
1. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
2. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. ↩
3. SEC. 165. LOSSES. (g) Worthless Securities. - (1) General Rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security Defined. - For purposes of this subsection, the term "security" means - (A) a share of stock in a corporation; ↩
4. SEC. 1211. LIMITATION ON CAPITAL LOSSES. (a) Corporations. - In the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges. 5. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩