Weather-Seal, Inc. v. Commissioner.
Weather-Seal, Inc. v. Commissioner
Docket No. 93799.
United States Tax Court
T.C. Memo 1963-102; 1963 Tax Ct. Memo LEXIS 241; 22 T.C.M. (CCH) 471; T.C.M. (RIA) 63102; April 8, 1963
David H. Wilson, Esq., 500 First National Tower, Akron, Ohio, for the petitioner. Eugene S. Linett, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income tax liability for the petitioner for fiscal years ended May 31, 1957, and May 31, 1958, in the amounts of $7,584.65 and $28,796.98, respectively, and an overassessment for fiscal year ended May 31, 1956, in the amount of $30,369.10. The only issue for decision is whether the sale of stock in two wholly-owned corporations resulted in an ordinary loss or a capital loss. All other issues have been settled by the parties. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. Petitioner, Weather-Seal, Inc., is a corporation which was organized under the laws of the State of Ohio on June 1, 1937. Petitioner kept its books and records on an accrual method of accounting. For the fiscal years ended May 31, 1956, 1957 and 1958, petitioner filed its corporate income tax returns with the district director of internal revenue, *243 Cleveland, Ohio. Since its inception, petitioner has been engaged in the manufacture, distribution and sale of storm doors and windows. Most of petitioner's sales were through retail branches. Some of these branches were owned by petitioner and others were owned by individual dealers. After a period of relative prosperity in the 1940's petitioner began to experience financial difficulties in the early 1950's. The change in business was caused by intensified sales competition resulting from over-production in the industry. As a consequence of business conditions, a shortage of qualified sales and sales management personnel developed. Competitors were continually trying to entice able men away from each other by setting these people up in business for themselves. Petitioner lost a number of men in this manner. Petitioner began exploring different methods of obtaining and keeping capable sales personnel in its branches. In the course of this search, a successful dealer-owned branch at South Bend, Indiana, was about to be closed out because the dealer had inherited a large sum of money. Petitioner was anxious to maintain this market and consequently purchased the stock of the branch. *244 Thereafter, petitioner sold the stock, at cost, to a promising young salesman who had been employed by the dealer. Petitioner was given a note for the entire purchase price of the stock. The new owner was successful in business, repaid the note and thus preserved a good sales outlet for petitioner's products. In view of the success of the South Bend operation, petitioner began to consider a similar plan with regard to its other branches. Petitioner felt that a plan whereby it could offer its branch managers an opportunity to become owners through efficient operations might be the difference between its surviving and failing. In 1954, petitioner began a plan to incorporate its branch offices in various sales areas. Each corporation was intended to serve as an exclusive sales outlet for petitioner's products. The new corporations were initially owned by petitioner as controlling shareholder, and were directly operated by resident managers who were also minority shareholders. [1]
*245 The manager, in each case, was a man selected by petitioner. The object of petitioner's plan was to insure the loyal support of the manager. Each manager, in a written agreement (hereinafter referred to as the Dealer Contract), was given an option to gradually purchase out of his earnings all of the outstanding stock of the sales outlet he managed. It was contemplated by petitioner in such cases that the manager would eventually own all the stock of the branch he managed. Petitioner placed several protective provisions in the contract. First, the stock was to be sold piecemeal over a period of time. Thus, there would be a period during which the manager's loyalty could be developed before he became the sole owner. Second, it reserved the right in each contract to sell its stock to the manager at book value. In a profitable branch, this would be in excess of petitioner's cost; however, petitioner had no intent or desire, under ordinary circumstances, to make a profit from this stock. Petitioner intended to, and in fact did, make all such stock sales at its cost. However, petitioner wanted to be free to sell at the higher price to a manager who was dealing with other manufacturers. *246 Finally, all of the contracts provided that if the new company had losses from its operations which exceeded the manager's investment in his stock, the agreement could be cancelled and the manager's stock returned to petitioner without any additional payment. There were about 15 branches incorporated under this plan. Of these, five have been profitable. One of the latter is now owned entirely by the manager. In the other four, the manager is still in the process of buying petitioner's stock. With one exception, no dividends have been paid to petitioner by any branch. In the one instance, a dividend of $1,572 was paid. In that case, the manager had purchased the last of petitioner's stock and then began selling the products of another manufacturer. Under the circumstances, petitioner decided to salvage as much as possible out of the situation. Except for one dividend, petitioner made no profit through the appreciation in value or through dividends from any of the sales branches it incorporated and sold under this plan. Two of petitioner's incorporated sales outlets were Weather-Seal of Cleveland, Inc. (hereinafter referred to as Cleveland) and Weather-Seal Tabler Co., Inc. (also *247 known as Weather-Seal of Lorain, Inc., and hereinafter referred to as Lorain). The proper tax consequences of sales by petitioner of its stock in the aforementioned corporations, occurring during the taxable year ended May 31, 1958, is the issue in controversy. Cleveland was incorporated under the laws of Ohio on October 10, 1956. Two individuals, Sanford Slifkin (hereinafter referred to as Slifkin) and Roy Shank (hereinafter referred to as Shank) were hired as co-managers of Cleveland. Cleveland's outstanding stock was issued as follows: Number
Class
of Shares
Subscriber
Class "A" Common
250
Petitioner
Class "B" Common
70
Petitioner
Class "B" Common
30
Slifkin and
Shank
Cleveland's business was unsuccessful and on January 28, 1957, the stock of Slifkin and Shank was surrendered pursuant to the terms of their Dealer Contract with petitioner. Thereafter, petitioner put its own personnel temporarily in charge of Cleveland and immediately began to search for another purchaser for its stock. Since petitioner wanted the buyer to manage the company in order to assure it of a sales outlet, petitioner conducted the search itself. Finally, after approximately *248 six or eight months, petitioner found a purchaser in one Don C. Hall (hereinafter referred to as Hall). At the time, Hall was employed as a salesman by another of petitioner's dealers. Hall purchased the Cleveland stock during petitioner's fiscal year 1958 for $10,882.37. Petitioner reported the sale on its books as follows: Investment - Stock in Weather-Seal of
Cleveland, Inc.
$32,000.00
Note, Don C. Hall (sale)
10,882.37
Loss charged to Reserve for Bad
Debts
$21,117.63 The said loss in the amount of $21,117.63 was charged to petitioner's reserve for bad debts and employed by petitioner in computing a claimed deduction for addition to bad debt reserve on its corporation income tax return filed for the taxable year ended May 31, 1958. Lorain was incorporated under the laws of Ohio on September 19, 1956. Raymond C. Tabler (hereinafter referred to as Tabler) was hired as manager of Lorain. Lorain's outstanding stock was issued as follows: Number
Class
of Shares
Subscriber
Class "A" Common
150
Petitioner
Class "B" Common
70
Petitioner
Class "B" Common
10
Raymond C.
Tabler
Lorain's business was unsuccessful, and during the *249 taxable year ended May 31, 1958, the stock of Tabler was surrendered pursuant to the terms of the Dealer Contract with petitioner. Subsequently, petitioner took over temporary management of Lorain while a search was conducted for another purchaser. Again, an interval of approximately six to eight months elapsed before the stock was sold to one C. Hicks (hereinafter referred to as Hicks). Thereafter, Hicks took over the active management of Lorain. Like Hall, Hicks had been a salesman at another of petitioner's branches. The sale of the Lorain stock was consummated during petitioner's taxable year ended May 31, 1958. Hicks gave petitioner his note in amount of $6,868.39. Petitioner reported the sale on its books as follows: Investment - Stock in Weather-Seal of
Lorain, Inc.
$22,000.00
Note, C. Hicks (sale)
6,868.39
Loss charged to Reserve for Bad
Debts
$15,131.61 The said loss in the amount of $15,131.61 was charged to petitioner's reserve for bad debts, and employed by petitioner in computing a claimed deduction for addition to bad debt reserve on its corporation income tax return filed for the taxable year ended May 31, 1958. Both Lorain and Cleveland, like *250 the other branches, were formed for the sole purpose of reviving petitioner's lagging sales program, as an attraction to qualified sales personnel. Petitioner never intended to make a profit from the sale of this stock, either through appreciation in value or through dividends. At all times petitioner held its stock in Cleveland and Lorain for the sole purpose of selling it, as soon as possible, to a qualified manager in order to further the sales of its manufactured products. In each case the sale was made following petitioner's active search for a buyer; and was made without any delay other than that resulting from the scarcity of qualified buyers. Each of the sales was the result of, and part of, petitioner's long-term program of developing dealer-owned branches. Petitioner did not hold the Cleveland and Lorain stock as an investment. Opinion The issue is whether the losses on the sale of the Cleveland and Lorain stock are deductible under section 162(a) [2] or section 165(a), [3] I.R.C. 1954, as contended by petitioner or under section 165(f)[4] and section 1211(a)[5] as contended by respondent. [6] Respondent concedes and we agree that "stocks or securities *251 will not be capital assets where acquired primarily for reasons of business necessity, and not for investment purposes." *252 It is evident that petitioner's sole concern in acquiring and selling the stock of its branches was to revive its lagging sales program by obtaining and keeping qualified sales personnel. Petitioner believed that a plan whereby it could offer its branch managers an opportunity to become owners through efficient operations could be the difference between its surviving and failing. These facts do not support respondent's contention that the losses are deductible only under section 165(g) and 1211(a), supra, as losses from the sale of a "capital asset." The losses here arose from the everyday operation of petitioner's business and as such are deductible in full either as an ordinary and necessary business expense or as a business loss. Corn Products Co. v. Commissioner, 350 U.S. 46 (1955); Western Wine & Liquor Co., 18 T.C. 1090 (1952); Charles A. Clark, 19 T.C. 48 (1952); Bagley & Sewall Co., 20 T.C. 983 (1953), affd., 221 F. 2d 944 (C.A. 2, 1955); Tulane Hardwood Lumber Co., 24 T.C. 1146 (1955); Electrical Fittings Corporation, 33 T.C. 1026 (1960); McMillan Mortgage Co., 36 T.C. 924 (1961). *253 It is clear that petitioner's plan of incorporating its branches and selling them to their managers was not aimed at acquiring new business. No new branches were involved. The plan was directed toward holding on to existing business. The stock of petitioner's branches was acquired for reasons of business necessity and not for investment purposes. [7]
Decision will be entered under Rule 50. Footnotes
1. Petitioner incorporated the branches by transferring the assets previously employed by the Branch and received in return all of the Class A voting stock and occasionally some of the Class B non-voting stock. The resident manager received a small amount of Class B nonvoting stock in return for a nominal payment to the company, usually made in the form of a note.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. ↩
3. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. ↩
4. (f) Capital Losses. - Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212↩. 5. SEC. 1211. LIMITATION ON CAPITAL LOSSES. (a) Corporations. - In the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges. ↩
6. Petitioner concedes that the losses are not deductible as bad debts as originally shown on its income tax returns.↩
7. The fact that petitioner listed the ownership of its stock in Cleveland and Lorain in its returns as an "investment" is not controlling. Corn Products Co. v. Commissioner, supra; Tulane Hardwood Lumber Co., supra; Doyle v. Mitchell Brothers Co., 247 U.S. 179↩ (1918).