**WATERMAN, LARGEN & CO., Inc.,**
v.
**The UNITED STATES.**
**No. 14–65.**

United States Court of Claims.
Nov. 14, 1969.

Davis and Nichols, JJ., dissented.

Joseph E. McAndrews, Washington, D. C., attorney of record, for plaintiff. Ivins, Phillips & Barker, Washington, D. C., of counsel.

Michael H. Singer, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant, Philip R. Miller; Washington, D. C., and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57 (a) [since September 1, 1969, Rule 134 (h)]. The commissioner has done so in an opinion and report filed on September

20, 1968. Defendant took no exception to the commissioner's findings of fact but did except to his recommended conclusion of law that the stock purchased by the taxpayer was an ordinary asset, not a capital asset. Plaintiff took no exception to the commissioner's findings of fact or to his recommended conclusion of law. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF COMMISSIONER

GAMER, Commissioner:

Plaintiff sues to recover alleged overpayments on its corporate income taxes for its taxable years ending December 31, 1961, and December 31, 1962.

The sole issue is whether the loss on the sale of certain stock which plaintiff owned is, as contended by plaintiff, fully deductible under either section 162(a) [1]

of the Internal Revenue Code of 1954 (26 U.S.C. § 162(a) (1964)) as one growing out of an ordinary and necessary expense incurred in carrying on its business, or section 165(a),[2] as an uncompensated loss sustained during a taxable year, or instead is, as contended by defendant, to be treated as a loss incurred on the sale of a capital asset under sections 165(f) [3] and 1211(a),[4] with the limitations on deductibility applicable thereto.

Plaintiff sold the stock in question in 1961, and on its income tax return for such calendar year reported the loss, amounting to $75,000, as a capital loss. However, in 1963 it filed timely claims for refund claiming a deduction as an ordinary loss in 1961 and a net operating loss carryover deduction for 1962. The claim not having been allowed, this suit followed.

In Booth Newspapers, Inc. v. United States, 303 F.2d 916, 157 Ct.Cl. 886 (1962), this court enunciated the basic principles governing cases such as these. It pointed out that although section 1221 of the Code defines the term "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)," (with certain exclusions, such as inventory) [5] and that "[a]s a general proposition * * * capital

---

* The dissenting opinions of DAVIS, *Judge*, and NICHOLS, *Judge*, follow the opinion of the trial commissioner which has been adopted by the court.

1. "Sec. 162. *Trade or Business Expenses.*
   "(a) *In General*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * *."

2. "Sec. 165. *Losses.*
   "(a) *General Rule.*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."

3. "(f) *Capital Losses.*—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212."

4. "Sec. 1211. *Limitation on Capital Losses.*
   "(a) *Corporations*—In the case of a corporation, losses from sales or ex-

changes of capital assets shall be allowed only to the extent of gains from such sales or exchanges."

5. "Sec. 1221. *Capital Asset Defined.*
   "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
   "(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
   "(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; * * *." 26 U.S. C. § 1221 (1964).

stock does constitute 'property' and, aside from stock sold by dealers in the usual course of their business, does not fall within any of the express exclusions of section 1221," so that a stock transaction would normally be "encompassed by the literal language of that section," nevertheless, the Supreme Court in Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), established an "elastic concept" of the term which, in certain cases, permitted transactions which would otherwise fall within the literal "capital asset" definition to be considered instead as "ordinary" income or loss. 303 F.2d at 920, 157 Ct.Cl. at 894. In the *Corn Products* case, the Court held that the buying and selling of corn futures for the purpose of protecting against price increases of corn, the basic raw material of the taxpayer's business, constituted an integral part of its manufacturing operations and was therefore to be treated as an ordinary business expense, and not as a capital investment or speculation. "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." 350 U.S. at 52, 76 S.Ct. at 24.

After reviewing the various cases of stock transactions by corporate taxpayers which had been decided following *Corn Products* and which had applied the doctrine established thereby, the court in *Booth Newspapers* formulated the governing principles as follows:

> * * * if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code.

> * * * The fact that securities are "property," in the broad sense of that term, is not conclusive. 303 F.2d at 921, 157 Ct.Cl. at 896.

And, to determine whether the transaction involved thus falls within the "ordinary" or the "investment" category,

> * * * the circumstances of the transaction (its factual background, the necessities of the particular business involved at the particular time involved, and the intentions of the taxpayer, both at the time the securities were originally purchased and at the time they were disposed of) are of crucial importance in the resolution of these cases. *Ibid.*

Applying these *Booth Newspapers* legal principles, and "factual background" criteria, including the "necessities" of plaintiff's business and the "intentions of the taxpayer" at the pertinent times, it is concluded that plaintiff has here carried its burden of establishing entitlement to the deduction in question as an "ordinary" loss.

Plaintiff was incorporated in May 1958 under the name of Waterman, Merrill, Largen & Co., Inc. Its business is the selling, on commission, of various types of yarn produced by its mill accounts. It grew out of the merging of the business interests of three yarn selling companies that had been previously operated by the three principals, Waterman, Merrill, and Largen. Their companies had specialized in the sales, as commission agents, of different types of yarn—Waterman's, based in Providence, Rhode Island, in cotton yarn, Merrill's, based in New York City, in worsted yarn, and Largen's, based in North Carolina, in synthetic yarn. The merging of the three companies into the plaintiff resulted in a single sales agency capable of offering a well-rounded line of yarns. The ability to offer such a broad range has many advantages. For instance, a salesman selling one type of yarn can sometimes discover uses by the customer for other types and thereby effect additional sales.

The largest account that Merrill brought to plaintiff upon its incorporation was that of the Elmvale Worsted Company, a Massachusetts corporation that manufactured worsted wool yarn at Pittsfield, Massachusetts. This fifty-year-old mill had one of the finest reputations in the country as a quality yarn producer. However, by 1957 it had become an unprofitable business. The dominant force behind the company was Carey R. Kinney, its president and owner of 83 percent of its stock.[6] Kinney and Merrill had been longtime personal and business friends and associates.[7] Elmvale had its own sales force selling its production of worsted weaving yarn. However, in an effort to stem Elmvale's unprofitable operation, Kinney, in the summer of 1957, requested Merrill to undertake a pilot experiment whereby Elmvale would enter the more profitable knitting yarn manufacturing field and Merrill would promote the sales of such yarn upon the usual sales agent's two percent commission. Merrill agreed and, indeed, succeeded to such an extent as, by May 1958, to warrant plaintiff's incorporation and the bringing into it of Merrill's accounts, including Elmvale, as its worsted division. By the latter part of 1958, the account had grown to the point that around thirty percent of Elmvale's production consisted of knitting yarn, with Elmvale becoming the third largest account plaintiff had and the principal factor in the worsted division of plaintiff's business.[8]

However, despite the increasing success Merrill was achieving in transforming Elmvale's production into the more profitable knitting yarns, the effort still did not result in transforming Elmvale into a profitable mill and, in early December 1958, Elmvale decided to terminate operations. Antiquated machinery and labor problems contributed significantly to its plight, as was then the situation in many New England mills. In addition, 1958 was a poor year in the textile industry.

The loss of this account was a serious blow to plaintiff. Elmvale was the most important segment of its worsted division, constituting its only substantial worsted wool account.[9] One of the principal reasons for having organized plaintiff just eight months before was to have such a worsted division. The Elmvale account was a steadily growing one and was, by December 1958, generating commissions at the rate of over $2,000 a month. This amount contributed substantially to defraying the overhead of plaintiff's New York City office, including the salaries of Merrill and another salesman, Heyman, who spent much of their time on the Elmvale account.[10] Plaintiff's own financial situation was weak. While it had been in operation only eight months, plaintiff had, as of December 31, 1958, incurred

6. Kinney also had other related interests. The Kinney Worsted Yarn Company was a one hundred percent owned subsidiary of Elmvale's. There was also a separate dye plant at Pittsfield.

7. Prior to organizing his own business in 1956, Merrill had been vice president in charge of sales first for the Whitman Yarn Company, one of the largest spinners of worsted yarns in the country, and then for the Abbott Worsted Company in Massachusetts until it went out of business in 1956. He was considered as one of the most experienced and knowledgeable worsted yarn salesmen in the country. Both Waterman and Largen had given him financial assistance to organize his own company in 1956 with the thought that sometime in the future the three might join forces.

8. Plaintiff's largest account was Carlton Yarn Mills of Salisbury and Cherryville, North Carolina, which operated through various divisions, its second largest being the Firestone Textile Division of Gastonia, North Carolina.

9. Because of a conflict of interest, Merrill had dropped another account when he acquired Elmvale.

10. A third salesman in the office, John Busher, was principally engaged in selling worsted yarns spun from synthetic fiber by the Turbo Orlon Division of Carlton Yarn Mills. Merrill and Heyman were stockholders of plaintiff and Busher had a one-year contract to May 1959.

an operating loss during this poor industry year of over $17,000, and was at that time actually insolvent.[11] Plaintiff had anticipated that the growing Elmvale account would go far toward eliminating the operating loss it was incurring during these first months.

Faced with this serious threat to its corporate existence, at least in its then form, plaintiff (Merrill) diligently attempted to obtain another worsted mill account but did not succeed. Such a selling agency account is extremely difficult to secure.

Kinney's son (whose given name was also Carey, but who is referred to as "Brud") had been associated with Elmvale since 1940. He had worked in every phase of the business, including production, management, and financing. It was the father's hope that his son would ultimately succeed him in becoming the dominant force in the business. In December 1958, he was serving in the capacity of treasurer.

Merrill explored every avenue to save the Elmvale account. Knowing of Kinney's attachment to the Elmvale name and his desire to insure his son's business future, Merrill inquired whether Kinney would be interested in continuing in business if a satisfactory mill could be found in some other location. Kinney replied that such a possibility would be given every consideration and Merrill immediately so advised Waterman and Largen.

Very shortly thereafter, still in December 1958, Largen located a mill in Laurens, South Carolina, which produced substantially the same products as Elmvale and which was for sale. Investigation of the prospect then proceeded, including personal visits to the plant by the Kinneys and one of their top production employees, Augeri, as well as by Merrill and Largen. A formal report made after a week-long intensive study by Brud Kinney and Augeri contained favorable findings.

Others with whom Kinney had had business relationships over the years were also interested in the continuation of the Elmvale operation, including Arthur Wellman of the Nichols Fiber Company of Boston, Massachusetts, which was the largest raw material manufacturer for the wool yarn industry, and Harris Bucklin of the Crompton-Richmond Company, Inc., of New York City, which was Elmvale's factor, and some meetings were held in Crompton-Richmond's offices concerning the prospective purchase of the Laurens mill and its operation. Kinney disclosed his willingness to become the dominant stockholder in a new corporation to be organized to take over the assets of the Laurens plant, the corporation to be named "Elmvale Worsted Company, Inc." (i. e., the same name as the Pittsfield company, with only "Inc." added). The new company would be headed by his son as president, who would move south, as would Augeri, who would become head of production. Kinney himself, principally because of his age (70), would not physically move south, but would become chairman of the board of directors. Nichols Fiber Company would continue as the raw material supplier and Crompton-Richmond as factor. As to plaintiff, since there would be no move south by the Elmvale sales force, the opportunity was open to become sales agent for the mill's entire production, i. e., the weaving as well as the knitting yarns. This would, of course, not only assure plaintiff's continued existence, but would open the door to even greater Elmvale commission possibilities.

However, this happy solution to plaintiff's problem was not to be easily realized. Kinney had always felt (a philosophy that was well known in the trade) that a selling agent for a mill's entire production should have a substantial financial interest in the mill. This would, he believed, produce a relationship in the nature of a joint venture and would thus constitute an incentive

---

11. Its assets were approximately $31,000 and its current liabilities over $47,000.

to the agent to do a better and more responsible selling job. He had seen many examples of "poor selling" by commission agents, such as effecting sales to financially weak customers, which had in turn resulted in disaster to the mill. Accordingly, at one of the meetings in Crompton-Richmond's offices, Kinney conditioned plaintiff's becoming the new Elmvale corporation's exclusive sales agent upon its putting $100,000 into the corporation's stock.

Plaintiff's three principals then immediately held meetings to consider plaintiff's future course. Plaintiff's finances did not permit such an expenditure. As shown, it was instead insolvent. Nor did the principals themselves have such an amount. They had already made personal loans to plaintiff to keep it going. They concluded, however, that, because of plaintiff's dire need for commissions, they would, in order to continue to exist at all, or at least to exist with a worsted wool division, have to raise the $100,000 somehow to regain the Elmvale account. The Laurens plant was then producing around 25,000 pounds of yarn weekly. Financially, it was just about breaking even. The Kinneys planned to move some of their newer equipment at Pittsfield to Laurens and increase the output to around 30,000 pounds a week or 1,500,000 pounds annually, which, at the then current market average of around two dollars per pound, would result in gross annual sales of about $3,000,000. At the customary two percent commission, this would produce around $60,000 in commission for plaintiff, which, even after deducting the substantial selling expenses involved, would still permit the liquidation of the $100,000 indebtedness in two-to-three years. Although the prospects for the mill's becoming a substantial moneymaker were not bright, conditions in the industry and the times

not being favorable (1959 was also a poor year, and the industry was, in addition, suffering from foreign import competition), the principals nevertheless felt that it would be able to continue producing for many years on at least a break-even basis, which would permit the generation of commissions in such prospective amount. Although the father Kinney would not move south and actively participate in the running of the plant, the son had been well trained to take over the running of such a mill. Furthermore, the father, as chairman of the board, would be available for guidance and advice. Augeri was a well-regarded production man. The excellent Elmvale name was to be retained, as well as, it was hoped, the old customers, since the plant would produce the same type of yarns.

On the above considerations, plaintiff's principals decided to attempt to borrow the $100,000. At one of the previous meetings in Crompton-Richmond's offices, Bucklin had offered to lend Kinney $100,000 to effectuate the purchase of the Laurens mill, but Kinney had declined the offer. Plaintiff's principals decided to ask Bucklin if Crompton-Richmond would lend such a sum to plaintiff. After reviewing the pertinent figures and the prospects for plaintiff's being able to repay the loan out of the prospective commissions, Bucklin agreed to make the loan.

Such loan was thereafter made by Crompton-Richmond to plaintiff, a note evidencing the loan executed by plaintiff (and personally endorsed by the three principals), the new Elmvale corporation formed (sometimes referred to as "Elmvale-Laurens") with Brud Kinney as president, 1,000 shares of the stock of the corporation issued to plaintiff for $100,000 [12] (the stock being pledged to Crompton-Richmond as collateral for the loan), and plaintiff became Elmvale-

---

12. Kinney's capital contribution was $135,-000, of which $35,000 consisted of the value of equipment moved from the Pittsfield mill, for which 1,350 shares were issued (to the Kinney Worsted Yarn Company). The Nichols Fiber Company received 500 shares for $50,000, and 150 shares were issued to stockholders with minority stock interests in the Laurens corporation in exchange for such stock.

Laurens' exclusive sales representative.[13] The new corporation commenced operations on June 8, 1959.[14]

For various reasons, Elmvale-Laurens, from the outset, suffered heavy operating losses. The sales plaintiff was able to effect for it, and plaintiff's commissions, fell far below expectations.[15] Adjustments were required in the schedule of payments on plaintiff's note to Crompton-Richmond. Friction developed between the mill personnel and plaintiff's sales force handling the account, i. e., Merrill and Heyman.[16]

By February 1961, friction between Brud Kinney on the one hand and Merrill and Heyman on the other had developed to the point that it was concluded Merrill and Heyman could no longer feasibly sell Elmvale-Laurens yarns for plaintiff. An agreement was reached redeeming their stock interests in plaintiff, they resigned as plaintiff's employees, and plaintiff's name was changed to its present form. New arrangements were then made by plaintiff for selling the Elmvale-Laurens yarns. However, the sales situation did not improve, and Elmvale-Laurens' financial condition continued to deteriorate.

Finally, and in good part at the instance of the Nichols Fiber Company, without whose liberal extension of credit Elmvale-Laurens would not be able to exist, Brud Kinney, on June 22, 1961, addressed a letter to plaintiff terminating its agency effective June 30, 1961.[17]

Thereupon, plaintiff, considering that the purpose of its being a stockholder no longer existed, promptly sought to dispose of its 1,000 shares of stock in Elmvale-Laurens.[18] It approached several persons who were considered as possible purchasers, but the only offer it received was one for $25,000 (approximately book value) from one Clifford Brown of Providence, Rhode Island. On July 21, 1961, one month after the termination of its agency, the stock was sold to Brown at such price, resulting in a $75,000 loss. It is the proper treatment of this loss [19] as "ordinary" or "capital" which is the subject of the dispute herein.

The above-recited facts leave little doubt that the circumstances underlying the purchase and sale of the Elmvale-Laurens stock qualify the loss as an "ordinary" one. This was the only way plaintiff could regain the lost Elmvale account, its only substantial wool worsted account and one of the mainstays of its worsted division, and, at the time, avoid liquidation or, at least, the dissolution of its worsted division, the establishment of which was the prime purpose of its having been organized in the first place. It seems plain that the situation falls within the *Booth Newspapers* prin-

---

13. To represent plaintiff's interests, Largen became a member of the board of directors.

14. Elmvale-Pittsfield had terminated operations at the end of February 1959.

15. Brud Kinney too participated in selling, calling on Elmvale-Pittsfield's old weaving yarn customers. In so doing he acted in the capacity of an employee of plaintiff paying him $10,000 a year for such services.

16. Elmvale-Laurens felt plaintiff was not obtaining the best possible prices for the mill's products, but plaintiff considered the mill to be unrealistic and that sales were being lost as a result. In addition, plaintiff complained about the poor quality of yarn being produced. Large quantities of yarn which plaintiff sold were rejected and returned by customers.

17. By letter of May 12, 1961, to John L. Stickley & Co., one of plaintiff's competitors (with copies to plaintiff and Brud Kinney), Wellman suggested Stickley's taking over certain of the Elmvale-Laurens accounts and such accounts were thereupon transferred to Stickley by Elmvale.

18. Plaintiff did not believe its agency was so terminable at the will of the mill, and considered instituting a suit. However, the mill was in such poor financial condition that plaintiff concluded a suit would not be worth the expense involved. As of March 31, 1961, Elmvale-Laurens was running a deficit in working capital of around $160,000.

19. Plaintiff ultimately liquidated the $100,000 indebtedness to Crompton-Richmond in 1964.

ciple as "securities * * * purchased by a taxpayer as an integral and necessary act in the conduct of his business" and that plaintiff was not "motivated" by "an investment purpose" in the "purchase or holding of the securities," at least in the sense in which the term "investment" is used in these cases.

While, as *Booth Newspapers* points out, the result, in cases involving this problem, normally depends upon the particular facts of the individual case showing the purpose of the purchase and holding of the securities,[20] the facts in the instant case are similar to those in which purchases of securities were made to effectuate the continued supply of vital materials or inventory upon which a business depends, and in which the losses involved were held to have been incurred in the ordinary course of business and not as stock investments. *Booth Newspapers, Inc., supra* (purchase by newspaper during a shortage period of stock in paper mill to insure supply of newsprint);[21] Electrical Fittings Corp., 33 T.C. 1026 (1960) (purchase by electrical conduit fittings manufacturer of stock in ductile iron foundry to obtain, during shortage period, a supply of required castings); Helen M. Livesley, 19 T.C.M. 133 (1960) (purchase by potato wholesale dealer of stock in potato shipping company to obtain a dependable potato source); Arlington Bowling Corp., 18 T.C.M. 896 (1959) (purchase by operator of bowling alleys of stock in bowling pin manufacturing corporation to insure, during a shortage period, a source of supply of pins); Smith & Welton v. United States, 164 F. Supp. 605 (E.D.Va.1958) (purchase by department store of shares of manufacturer of ladies' suits to maintain continued supply of the line); Tulane Hardware Lumber Co., 24 T.C. 1146 (1955) (purchase by a lumber dealer of debentures of a plywood manufacturer to insure a source of plywood);[22] Western Wine & Liquor Co., 18 T.C. 1090 (1952) (purchase by wholesale liquor dealer, during a whiskey shortage, of shares of distiller to obtain whiskey inventory).[23]

20. "Whether an expenditure is directly related to a business and whether it is ordinary and necessary are doubtless pure questions of fact in most instances." Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 254, 88 L.Ed. 171 (1943).

21. Journal Co. v. United States, 195 F. Supp. 434 (E.D.Wis. 1961), similarly held as ordinary a loss on paper mill shares bought by a newspaper publisher to obtain newsprint inventory during a shortage period.

22. In Logan & Kanawha Coal Co., 5 T.C. 1298 (1945), a wholesale coal dealer which sold for its own account, as well as on commission, purchased stock in several of the coal companies which supplied it with coal for the primary purpose of maintaining favorable relations with such companies and thereby enabling it to acquire and maintain sources of supply. The Tax Court held that losses on the sales of such stock constituted capital losses since shares of stock, being "property," were capital assets as defined by the Code and that, under the circumstances, the shares in question did not fall within any of the statutory exceptions (inventory, etc.). Thereafter, in Commissioner of Internal Revenue v. Bagley & Sewall Co., 221 F.2d 944 (2d Cir. 1955), the Second Circuit held that a loss incurred as a result of the required posting of Government bonds as security for the performance of a contract was an ordinary loss since it was incurred only as an incident of carrying on the business of the taxpayer. It rejected the theory that simply because a security constitutes a "capital asset" under the Code, a loss incurred on the purchase and sale thereof necessarily constitutes a capital loss and instead held that it was not possible to "wrench" the purchase and sale from "its setting," (at 947) all the facts and circumstances relating thereto being required to be examined. In *Tulane Hardware*, the Tax Court held that in view of Commissioner v. Bagley & Sewall Co., its previous decision in Logan & Kanawha Coal Co. would no longer be considered as authoritative.

23. Charles A. Clark, 19 T.C. 48 (1952); Edwards v. Hogg, 214 F.2d 640 (5th Cir. 1954); and Hogg v. Allen, 105 F.Supp. 12 (M.D.Ga.1952), are similar whiskey supply cases.

Even closer to the instant case on the facts is Southeastern Aviation Underwriters, Inc., 25 T.C.M. 412 (1966), where the loss on the purchase by an aviation insurance manager, of shares in an insurance company, made to replace a lost management contract on which the taxpayer had earned substantial commissions, was held to constitute an ordinary business expense, as well as Hagan v. United States, 221 F.Supp. 248 (W.D. Ark.1963), where such a deduction was also allowed on the loss incurred by a salesman on stock purchased in a customer's business to insure that the customer would continue to make its exclusive purchases through him and on which he earned substantial commissions.

Defendant contends that plaintiff purchased the Elmvale-Laurens stock not, as a temporary expedient, to maintain its existing business, as was true in some of the "source of supply" cases, but, instead, for the purpose of expanding its business on a permanent basis. It points out that when Elmvale-Pittsfield decided to cease operations plaintiff was earning commissions from it at the rate of around $25,000 a year while plaintiff hoped to realize commissions from Elmvale-Laurens of around $60,000 a year. It argues that expenditures for expansion, exceeding those necessary to the conduct of an existing business, are recognized as capital investments.

It is true that when expansion is the underlying basis of the stock purchase, without any showing of business necessity relating to the perpetuation of the life of the existing business, the expenditure has been regarded to be in the nature of a capital investment rather than an ordinary and necessary business expense. Chase Candy Co. v. United States, 126 F.Supp. 521, 130 Ct.Cl. 102 (1954); Duffey v. Lethert, 11 A.F.T.R. 2d 1317 (D.Minn.1963). And in *Smith & Welton, supra,* the court, in sustaining the loss there involved as an ordinary and necessary business expense, drew a distinction between cases in which securities are acquired to obtain an advantage which did not previously exist as against situations where securities are purchased to protect what is presently existing but threatened.[24]

However, accepting these principles,[25] it seems plain they should not be so rigidly applied as to encompass a situation such as the instant one where the increase in business is so intimately linked to continued existence and such existence is the basic reason for the purchase. Increased business may well flow from continued life, but an expenditure basically designed to insure continued life should not be denied its status as an ordinary and necessary business expense simply because it may also possibly result in business enlargement. In *Booth Newspapers,* this court did not hesitate to place the stock loss resulting from the newspapers' attempt to obtain a full supply of newsprint in the "ordinary and necessary" category even though, as the findings show, the tonnage of newsprint replaced substantially exceeded the tonnage lost during the shortage. Similarly, in *Southeastern Aviation Underwriters, Inc., supra,* the loss on the stock purchase, made for the purpose of replacing the lost management contract on which the taxpayer had earned substantial commissions, was held to constitute an ordinary business expense although the facts showed a very substantial in-

---

24. *Cf.* Weather-Seal, Inc., 22 T.C.M. 471 (1963), where, in holding losses on the purchase by a manufacturer of stock in retail outlets to be fully deductible as a business expense since the stock "was acquired for reasons of business necessity and not for investment purposes" (at 474), the court emphasized that the stock purchase plan was not aimed at acquiring new business but only to retain existing business.

25. In *Helen M. Livesley, supra,* the court felt that, in order for a stock purchase to constitute a reasonable and necessary act in the conduct of a business, the taxpayer is not required to go so far as to prove that, absent the purchase, his business would have been crippled or would have failed. "Responsible businessmen make legitimate expenditures every day, which would not measure up to such a 'survival' test." 19 T.C.M. at 140.

crease in commissions under the new contract. It was the attempt to replace the loss of an important commission account which threatened the taxpayer's survival that was determinative. The record shows that the same economic necessity motivated plaintiff in the instant case.

Defendant further says that plaintiff's purchase of the Elmvale-Laurens shares should be regarded as capital in nature because (a) the stock "at the time of its purchase appeared to be a particularly attractive investment"; [26] and (b) plaintiff had no assurance it would continue to earn commissions since its agency was terminable at the will of the mill, so that the purchase should therefore be considered separately as an investment, disassociated from the commission problem.

The record does not support these contentions. First, the evidence does not fairly support any conclusion to the effect that plaintiff's motivation was the opportunity of making "a particularly attractive investment." The Laurens mill at the time of plaintiff's stock purchase therein was only breaking even. The times were not propitious for dynamic growth by woolen mills. The years 1958 and 1959 were poor ones in the industry. Competitive imports presented a serious problem. The evidence is plain that plaintiff was not seeking an attractive stock investment in the sense of capital appreciation or a source of dividends. It was primarily interested only in a source of commissions to replace the lost Elmvale-Pittsfield account, to save its woolen division, and to avoid liquidation. Plaintiff was hardly in a position to be seeking stock investments. This was not a situation of an investor seeking an outlet for surplus funds. Plaintiff was, instead, insolvent. To make this purchase it had to borrow the entire sum. The record makes plain that the purchase was not its idea or desire at all but that it felt obliged to make it because that was the condition imposed upon it by Kinney for plaintiff's becom-

ing the mill's commission agent. As the court said in *Booth Newspapers*, "The difficulty with defendant's position is simply that the record will not support a conclusion that plaintiffs were investment-minded when they purchased the stock." 303 F.2d at 921, 157 Ct.Cl. at 896. Plaintiff had never before nor has it ever since owned stock in any other corporation, a fact which, in cases such as these, has been given important weight. *Arlington Bowling Corp., supra; Electrical Fittings Corp., supra;* Hagan v. United States, *supra; Tulane Hardware Lumber Co., supra; Western Wine & Liquor Co., supra.* However, the fact that an expenditure is of a once-in-a-lifetime type does not prevent it from falling within the category of an "ordinary" business expense. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Planters Exchange, Inc. v. United States, 57–1 USTC ¶ 9565 (N.D. Fla.1957); *Western Wine & Liquor Co., supra.*

It is true that plaintiff did not expect the Laurens mill to flounder as it did. With a continuation of the Elmvale name, as well as the Kinneys' dominant financial interest and management, and a top Elmvale-Pittsfield production official heading up the production at Laurens, plaintiff reasonably expected Laurens to continue for many years on at least a break-even basis. But this was all that was necessary for plaintiff to earn substantial commissions over such years.

On the terminability question, plaintiff denies that Elmvale-Laurens had the legal right to terminate its agency agreement, contending that its $100,000 stock purchase differentiates its situation from that of the usual commission agent in this industry, wherein agency arrangements are normally terminable at the will of the mill. It is, however, not necessary to decide this disputed legal issue since it would not, in any event, affect the outcome. Plaintiff had every assurance that it would if it met the stock-purchase condition imposed, be

26. Def.'s Brief, p. 15.

Elmvale-Laurens' exclusive commission agent and there was no reason to doubt the bona fides or the permanency of the arrangement. Plaintiff had previously and successfully acted as Elmvale-Pittsfield's knitting yarn sales agent, and Merrill and Kinney had had a long and cordial business and social relationship. The legal right of Elmvale-Laurens to terminate the agency, even assuming there was such a right, would not affect the conclusion that the reasonably expected continued receipt of Elmvale commissions was the underlying reason for effecting the stock purchase.

Finally, defendant argues that, "even if the stock was non-capital when acquired, the taxpayer changed the character of the securities by holding the stock for over three years since it could have sold it (except to another sales agent) without jeopardizing its exclusive agency with Elmvale Laurens." [27]

The record also fails to support this contention. The stock-purchase condition imposed on plaintiff by Kinney was based upon the theory that an agent having a financial interest in the mill would perform better. A sale of the stock while plaintiff was still acting as agent would frustrate the entire purpose of the arrangement. Defendant's assertion that plaintiff was free to sell the stock (except to another commission agent) at any time after its purchase is based on Brud Kinney's testimony to such effect. However, he was not present at the particular meeting at which his father had imposed the requirement, and the understanding of all of plaintiff's principals, which was the only rational one under the circumstances, was that plaintiff was obligated not only to purchase the stock but to retain it during the period it was acting as commission agent. As soon as plaintiff's agency was terminated, plaintiff disposed of the stock to the only person from whom it obtained an offer.

As the cases upon which defendant relies show, Gulftex Drug Co., 29 T.C. 118 (1957), aff'd per curiam, 261 F.2d 238 (5th Cir. 1958); Missisquoi Corp., 37 T.C. 791 (1962), it is true that securities originally acquired as an "integral and necessary act in the conduct of [a] business," (*Booth Newspapers, supra*, 303 F.2d at 921, 157 Ct.Cl. at 896 and therefore noncapital at such time, may assume the nature of a capital investment if held substantially beyond the time when the acquisition of the stock has served its purpose. As shown, however, the facts herein do not fall within the ambit of this rule.

For all the reasons stated above, plaintiff is entitled to recover. The amount of the recovery should be determined pursuant to Rule 131(c).

DAVIS, Judge (dissenting):

I have been persuaded by Judge Nichols' analysis and his general approach, but I cannot join in all the observations in his opinion. He seems to me quite right in stressing that (a) if the test is to remain (in shorthand) investment-mindedness vs. business-purpose, that gauge must be applied to the objective situation, rather than to the secret, unexpressed-at-the-time subjective intention of the taxpayers; (b) there are grave dangers in elevating the uncommunicated subjective intention of the taxpayers to a dominant, or important, role in applying the standard; and (c) in this case, the senior Kinney's insistence that the taxpayer invest in the new company, and taxpayer's acquiescence in that demand without any demur, require the conclusion that, objectively viewed, one of the taxpayer's substantial purposes had to be investment, *i. e.* an interest in the profitability of the new company (and not solely in the taxpayer's commissions). I note, in addition, that I am not yet convinced that the standard of investment or business purpose is appropriate for this type of case in which a permanent acquisition of stock is made, and I reserve my position on that point since the court accepts

---

**27.** Def.'s brief, p. 15.

the investment test in this instance without further examination.

NICHOLS, Judge (dissenting):

This is an action to recover alleged overpayments of corporate income taxes for the calendar 1961 and 1962 taxable years. Plaintiff originally showed on its returns a loss on a sale of capital stock as capital losses, but after becoming aware of certain court decisions filed claims for refund. Its position now is that the losses are deductible as ordinary and necessary business expenses (Internal Revenue Code of 1954, Sec. 162(a)) or as an uncompensated loss sustained during the taxable year (Internal Revenue Code of 1954, Sec. 165(a)). Defendants says the loss was incurred on the sale of a capital asset under §§ 165 (f), 1211(a), and 1221, with the limitations on deductibility applicable thereto. These are that such losses are allowable only to the extent of capital gains. The returns reflected no such capital gains. I agree with defendant's position.

The facts are set forth in the findings and are repeated here only to the extent necessary to give the setting for my conclusions of law.

Plaintiff was incorporated in May 1958, and its business was and remained to sell, on commission, various types of textile yarn produced by its mill accounts. Separation of the function of selling from production had been common in the textile industry. It was important for such a concern to be able to offer vendees all the various types of yarn, and its organization brought together three specialists in various yarns. Mr. Merrill, one of the organizers, brought into the new concern an account with Elmvale Worsted Company, a Massachusetts corporation, of Pittsfield, Massachusetts. Its product had been wool weaving yarns almost exclusively, but Mr. Merrill had induced it to stress wool knitting yarns, believed at that time to be a more promising line. He had sold for it all its production of knitting yarns amounting to one fourth to one third of its business, on the 2%

commission standard in the industry. Persons not here involved effected the remainder of Elmvale's sales.

But Elmvale Worsted was still not returning a profit and Mr. Carey R. Kinney, who owned 83% of its stock, informed Mr. Merrill that it must close. The industry at that time was in grave difficulties because of the competition of low-cost imports. The record also reflects that the textile industry was a low-wage one, by American standards, and that Massachusetts had become a high-wage area because of the impact of the prosperous electronics industry. This naturally created labor difficulties for Elmvale, as for other Massachusetts textile concerns. Besides, Elmvale's plant was antiquated.

Mr. Merrill put forward the idea to Mr. Carey Kinney that he might organize a new company, to operate in the South, as an alternative to merely closing. To plaintiff the loss of commissions on Elmvale sales was only one aspect of the threatened disaster: the unbalancing of its line was another. It was committed to carry certain high-salary personnel and could not reduce its overhead to adjust to the threatened loss of business. Thus it had every incentive to help keep Mr. Carey Kinney in production in one way or another.

The latter was receptive to the idea, largely because he desired to secure a career in the textile industry for his son, generally referred to in the record as "Brud" Kinney. Mr. Merrill and another principal owner of plaintiff, Mr. Largen, located a plant that could be purchased at the small town of Laurens, South Carolina. This plant could spin worsted yarn and, supplemented by some machinery from Pittsfield, could produce enough knitting yarn to keep plaintiff in the business. It was a going concern with an experienced labor force.

A deal was now worked out according to which a new corporation was to be formed to operate this plant. Its name was to be Elmvale Worsted Company Inc., i. e., the same as the Pittsfield con-

cern with the addition of "Inc." Brud Kinney would manage it and his father would be Chairman of the Board but would not move South. Every effort would be made to maintain the high reputation of the Pittsfield concern and sell the same products to the same customers.

It was agreed that plaintiff was to be the exclusive sales agent, which meant it would get its 2% commission on every pound that was sold, whether it effected the sale itself or not. As usual in the industry there was no formal or even informal agreement as to how long the agency would last or how it could be terminated.

The elder Kinney, however, insisted that he would not put plaintiff in that position unless it subscribed to stock in the new company. His purpose in taking this position was to eliminate a conflict of interest he deemed to exist as between selling agents and mills, when wholly independent financially. Mills, to earn a profit, had to work on long production runs of uniform specifications. Agents, however, to enlarge their commissions would load up the order board with variegated small orders necessitating frequent interruptions of production. The commission was earned whether or not the order was filled at a profit. Plaintiff's officers fully understood Mr. Kinney's position and his reasons for it, to the extent that Mr. Merrill anticipated that Mr. Kinney would make this demand even before he made it. Whether because of similar thinking or not, the complete independence of mill and agent that once had prevailed had become somewhat exceptional in that industry. There is nothing to suggest that Mr. Kinney could not have obtained the needed capital elsewhere. In fact, plaintiff was practically insolvent, had no funds available for investment, and it borrowed the $100,000 it was required to put up from a factor who would have loaned the money direct to Elmvale just as readily. For this $100,000 it received ⅓ of the stock, and nominated Mr. Largen to serve on the Board of Directors.

The rest of the stock went to the Kinneys, to the supplier of the raw material, wool tops, who put up $50,000, and a small amount to the former owners of the Laurens plant.

According to Mr. Waterman, the president and treasurer of plaintiff (R 40):

We felt that with Mr. Kinney's background and experience in worsted manufacturing and with Mr. Wellman, who was the largest top maker in the country, and with Mr. Merrill's experience, broad experience in the field of selling worsted yarns that the operation should be successful. We didn't expect any great General Motors out of it, but we felt it would be a successful operation that would remain in business for a number of years and generate commissions to us.

They did not buy the stock for appreciation in value or dividends, but to get the commissions. They "would not have been upset" by an appreciation in value "but that was not the purpose." Appreciation appeared unlikely, since at that time worsted yarn organizations were "not very successful." On the basis of full production they "hoped and expected" to get $60,000 a year in commissions, out of which allocable salaries and other overhead would have to be paid. Still, they hoped to earn enough money from the account to pay off the loan from the factor in two to three years.

This was the only stock purchase plaintiff had ever made, up to the time of trial.

It is of interest to note that the principals of the plaintiff corporation hardly hoped that their commissions from Elmvale and all other sources would do more than pay their own salaries; for plaintiff, too, dividends or stock appreciation were a long way off at best. Such was the state of this once flourishing industry.

As it turned out, even these modest hopes were dashed. For reasons not made clear in the record, Elmvale Worsted Company Inc. was consistently unsuccessful, both as to gross volume and as to

profits. It became heavily in debt to the wool top supplier. What Winston Churchill called "the diseases of defeat" began to appear. Among these people, who were too gentlemanly and understood each other too well to need written agreements, there developed something like acrimony. In the spring of 1961 the gulf between Mr. Merrill and Brud Kinney became too deep for the former to continue handling the account. He was persuaded to withdraw amicably from the plaintiff corporation and others were employed to take the account over. Nevertheless, Mr. Wellman, the wool top supplier, who to all intents was in control of Elmvale Inc. owing to its unpayable debt to him, began to angle with other agents. On June 22, 1961, Brud Kinney sent plaintiff a notice in writing that the agency was terminated effective June 30.

Plaintiff's officers were naturally irate at this. They had supposed in some vague way that their stock purchase removed their agency relationship from the category of those that were terminable at will. They consulted South Carolina counsel who gave them little encouragement. Apparently the only thing counsel could think of was some kind of minority stockholder's suit, which he thought would be futile because of the insolvency of Elmvale Inc. If they appeared to be getting anywhere in the suit, Mr. Wellman could seize the assets in collection of his debt, leaving an empty shell for the litigants.

Plaintiff was left with its $100,000 debt to the factor, which it honored and paid in full. It endeavored to sell the stock and was able to realize but $25,000. The difference, $75,000, is the loss whose proper tax treatment is at issue here.

There can be no doubt that from the accountant's point of view the investment was a capital investment and the loss a capital loss. Mr. Brown, a qualified CPA, so treated them on the plaintiff's books and tax returns. He testified he would treat an inventory loss as an ordinary loss. He was asked (R 181):

Q Why did you treat this loss differently?

A Because I had considered this as an investment in a capital asset.

Q Why?

A Because that's what it was.

It is not unusual in these cases, nor decisive, for the taxpayer to repudiate the treatment originally given the transaction on its books or tax returns. It ought to give pause when the accountant still says he was right the first time. However, there appears to be a divergence between the accounting and the legal point of view in the present premises. The source of this divergence, its nature, and extent, are for consideration here.

The landmark case is Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). That taxpayer, in the business of producing corn sugar and other corn products, had become accustomed to purchase corn futures at harvest time each year, at favorable prices, to guard against high prices due to droughts before the next harvest. At times it sold these futures and purchased spot corn instead. It claimed the futures were capital investments and that gains when realized were entitled to capital gains treatment. The Court held otherwise, viewing the transactions as an "integral part" of the business, "a form of insurance against increases in the price of raw corn" (p. 50, 76 S.Ct. p. 23). "Congress intended that profits and losses arising from the everyday operations of a business be considered as ordinary income or loss rather than capital gain or loss" (p. 52, 76 S.Ct. p. 24). The capital gains provision, being "an exception from the normal requirements of the Internal Revenue Code" must be construed strictly. Thus, in effect, the specific exceptions such as stock in trade or inventory to the capital asset definition in Internal Revenue Code, Sec. 1221, were held not to comprise all the exceptions there were.

In Booth Newspapers Inc. v. United States, 303 F.2d 916, 920, 157 Ct.Cl. 886, 894 (1962)'; this court referred to the *Corn Products* rule as an "elastic concept" which in certain cases would permit transactions which would otherwise fall within the literal definition of a capital asset to be considered instead as ordinary income.

United States v. Rogers, 286 F.2d 277 (6th Cir. 1961), cert. denied, 366 U.S. 951, 81 S.Ct. 1902, 6 L.Ed.2d 1243, reh. denied, 368 U.S. 870, 82 S.Ct. 27, 7 L.Ed. 2d 71, illustrates the converse of *Corn Products*: taxpayer, a cattle dealer, bought and sold futures in other commodities with the idea that somehow he was hedging. The court held these were capital transactions because not integral to the business.

The largest class of cases following *Corn Products* consists of those (commonly referred to as "source of supply cases") where, as in *Corn Products* itself, a purchase of securities or other assets, normally capital, is made as an expedient to tide the buyer over a period of shortage and high prices of some material vitally needed in its business as stock in trade or inventory. Our own FS Services Inc. v. United States, 188 Ct.Cl. 874, 413 F.2d 548 (1969), and Booth Newspapers Inc. v. United States, *supra*, decisions are perhaps typical. Booth Newspapers had bought stock in a paper mill during a period of acute newsprint shortage to assure a newsprint supply. FS Services bought a refinery during a period of acute shortage of petroleum products, which FS Services had to have to supply to its customers. In both cases this court assured itself (a) that the taxpayers knew they were acquiring property that would not be attractive to them to own in the long pull, after the shortage ended, and (b) that there was an intention to dispose of the acquisition when the shortage ended, which was carried out with reasonable promptness. In *Booth*, the acquired plant made high-quality writing and book paper and had to be converted to make newsprint which even

so was of poor quality. In *FS Services*, the purchased refinery was outclassed in efficiency by newer plants and would become obsolete as soon as a sufficient number of the latter were in stream. Obviously, either taxpayer might have decided ,to become an integrated producer. as a permanent thing, producing its own raw material or inventory. To have held the purchase not a capital transaction in such a case would be to make a dent in the legal concept of a capital transaction not warranted by anything said or done in *Corn Products*. We referred with approval to Missisquoi Corp., 37 T.C. 791 (1962); and Gulftex Drug Co., 29 T.C. 118 (1957), aff'd per curiam 261 F.2d 238 (5th Cir. 1958); in both of which the investment was held capital because held too long after the supply emergency ended. Defendant cited ,the above two cases in *FS Services*, but we held them not applicable there because *FS Services* started trying to get rid of its refinery when no longer needed with reasonable promptness as we thought.

Other cases allowing ordinary loss or requiring ordinary gain treatment for this kind of "source of supply" transaction are: Smith & Welton v. United States, 164 F.Supp. 605 (E.D.Va.1958); Electrical Fittings Corp., 33 T.C. 1026 (1960); Tulane Hardwood Lumber Co., 24 T.C. 1146 (1955); Helen M. Livesley, 19 T.C.M. 133 (1960); Arlington Bowling Corp., 18 T.C.M. 896 (1959); Edwards v. Hogg, 214 F.2d 640 (5th Cir. 1954); Journal Company v. United States, 195 F.Supp. 434 (E.D.Wis.1961); Mansfield Journal Co. v. Commissioner of Internal Revenue, 274 F.2d 284 (6th Cir. 1960).

In arriving at our recent *FS Services* decision we concluded that no innovation was required of us then. On the facts found, precedents binding on us dictated the result. The main thrust of defendant's efforts were to refute our commissioner's fact findings which, if accepted, were practically conclusive.

Purchases of stock wholly or partly to obtain employment must be common.

Many stockholders of closely held corporations must expect to be employed to render the corporation services they are capable of rendering, which the corporation needs. Yet the cases applying *Corn Products* to stock purchases made with this motive are not very numerous. Examples are: Hagan v. United States, 221 F.Supp. 248 (W.D.Ark.1963), (plaintiff, a commission salesman, purchased stock in a business he had been selling to in order to retain it as a customer. The stock became worthless. Held, ordinary loss.) Southeastern Aviation Underwriters, 25 T.C.M. 412 (1966), (plaintiff, an aviation insurance manager, bought stock in an insurance company so as to be employed by it as its aviation insurance manager; later he sold stock at loss. Held, ordinary loss.) Charles W. Steadman, 50 T.C. 369 (1968), (plaintiff, an attorney, bought stock in a corporation of which he was secretary and general counsel in order to avert a change of control which would have cost him these jobs and the fees incidental. Stock became worthless. Held, ordinary loss. There is a dissent asserting it was not shown the corporation was a vital source of taxpayer's practice. This case is on appeal in the 6th Circuit.). See also, Troxell and Noall, Judicial Erosion of the Concept of Securities as Capital Assets, 19 Tax Law Review 185, 204 (1964) and authority cited.

These cases, like the one at bar, clearly fall outside all the statutory exceptions to the capital asset concept. For this reason, before they were decided one commentator suggested that the "source of supply" cases would not be precedents for a case:

> * * * On the other hand, where the purchase is to acquire a long-term (capital) right, such as an exclusive agency * * *. Freeman, Is There A New Concept Of Business Asset?
> 36 Taxes 110, 112 (1958).

This comment would be more helpful if not made by Freeman in course of an attempt to demonstrate that *Corn Products* and other source of supply cases fall within the inventory exception, an analysis I find to be strained. Most commentators agree, reasonably in my opinion, that the Supreme Court did intend to engraft a new exception on to Sec. 1221 in addition to the inventory exception. Brown, The Growing "Common Law" of Taxation, 34 S.Cal.L.Rev. 233, 249 (1961); Chirelstein, Capital Gain And The Sale Of A Business Opportunity: The Income Tax Treatment of Contract Termination Payments, 49 Minn.L.Rev. 1, 41 (1964); Kauffman, A Second Look At The Corn Products Doctrine, 41 Taxes 605 (1963); Surrey, Definitional Problems In Capital Gains Taxation, 69 Harv.L.Rev. 985, 993 (1956); Troxell and Noall, Judicial Erosion Of The Concept Of Securities As Capital Assets, 19 Tax L.Rev. 185 (1964); Tucker, The Warren Court: Its Impact On The Capital vs. Ordinary Concept Under The Internal Revenue Code, 17 Kansas L.Rev. 53, 59 (1968); Note, Judicial Treatment Of "Capital" Assets Acquired For Business, 65 Yale L.J. 401, 406 (1956). The Freeman comment does validly suggest the point, however, that the source of supply cases have a conceptual nexus with the express statutory exception in Sec. 1221 for inventory, which is lacking in the case of purchases of stock to secure a source of employment. It could well be that the Congress which enacted the inventory exception would have added an explicit exception for stocks purchased primarily to secure a source of inventory if it had thought of it, for otherwise the apparent statutory plan is imperfectly expressed. No such argument can be made in the case of a source of employment stock purchase.

Thus the Supreme Court's *Corn Products* case had a takeoff point in the language of the statute which is lacking here. Moreover, the decided cases cited to us do not provide a body of law in the source of employment field which can be deemed *stare decisis* in this court. The most I can derive from the cases and comments is that the court should not flinch away from an innovative approach to accomplish the statu-

tory scheme more perfectly, merely because some critics might call it judicial legislation.

Still, if we are to make new tax rules, we should do so in responsible fashion. The defendant points out with some justice that in any case where possible employment came as one of the usufructs of stock ownership, a business rather than an investment motive could be asserted if the stock were sold at a loss, and forgotten if it were sold at a profit. It is not lightly to be supposed that the Congress intended to present taxpayers with so golden an opportunity to manipulate the facts to secure a tax advantage. To assuage the defendant's concern, it is necessary to ascertain the presence of business as against investment purpose by manifestations in the external world rather than merely by subjective intent allegedly locked in the taxpayer's breast and first disclosed years later. Then the taxpayer would have to accept tax consequences unfavorable to himself if he sold at an advance stock he had purchased with predominant business motivation. I think this is the kind of equitable balance the Supreme Court intended to bring about in *Corn Products*.

This kind of external evidence presumably would exist if the stock manifestly did not have the market value the taxpayer put out for it. Then it might be inferred the purchase was really a disguised kickback or rebate to secure employment. But that is not this case. Taxpayer does not seriously contend that the stock was overpriced or that the new corporation did not have good prospects. On the other hand, taxpayer does not offer any clear extrinsic proof that the case is not the ordinary one of the investor hoping for employment as one of the usufructs of stock ownership.

If plaintiff's officers remember their motives correctly, they did not reveal them at the time to their co-entrepreneurs. The whole point of getting $100,-000 of capital indirectly from the factor through plaintiff, rather than directly from the factor, was to secure the services of an agent who would be investor minded. Yet the officers now say their sole object was commissions, just as if they held no stock. Of course, if they had said this to Mr. Kinney, Sr., at the time, the whole deal would have been off. In effect they say they were withholding from Mr. Kinney what he had bargained to receive.

If taxpayer bought the stock only to obtain the agency it is remarkable it did no more to assure that the agency would not be terminable by the principal at its will. It is true they say that somehow, they thought their stock ownership took the agency out of the at will category, but they do not explain how, instead of at will, they expected it to be terminable. Surely they did not imagine it to be terminable under no conditions! If they thought their stock purchase was an investment, their failure to tie in their purchase to the duration of their agency is at once explained. This point by itself cannot be deemed conclusive, however. The exhaustive analyses by Troxell and Noall, *cit. supra*, shows the existence of some source of supply cases where the taxpayer acquired an interest, but not control.

When the principal terminated the agency, in plaintiff's eyes wrongly and prematurely, plaintiff took no steps to rescind the entire transaction.

Plaintiff says its need for the agency was so great as to put it under virtual duress, under all the circumstances, as recounted *supra* and in the findings. However, it appears Mr. Kinney was just as much in need of plaintiff, as plaintiff was of him. Only plaintiff's Mr. Merrill had developed the market for wool knitting yarns which the new business was to exploit. Elmvale Worsted Company, Inc., was born because of the need of all its principals for one another. There is anyway, nothing to show that plaintiff was so desperate it could not bargain with Mr. Kinney on an arm's length basis and negotiate for relief from any conditions it deemed unfair or onerous.

I do not view this analysis of the facts as in conflict with Finding 29 because I read that finding as referring to a state of mind that was never disclosed to anyone until plaintiff's officers testified in this case. Not even to their own account! I do not dispute that they had such a state of mind, but I am not willing to give it legal significance in the absence of communication. Thus I do not regard the failure of defendant to except to Finding 29 as conclusive against it. I think it is important to say that my majority colleagues, if I read their minds aright, do think that my position flouts Finding 29. An understanding of this may contribute to the proper future use of this case as a precedent.

In Goodman v. United States, 182 Ct. Cl. 662, 390 F.2d 915, cert. denied 393 U.S. 824, 89 S.Ct. 87, 21 L.Ed.2d 96 (1968), the issue was whether certain gains from sales of real estate should be regarded as from property held for sale to customers in the ordinary course of business, under the 1939 Code, or as capital gains. A majority of the court held for the former view, disregarding taxpayers' testimony that they had an investment intent, in favor of contrary conclusions drawn from surrounding facts and circumstances. There were dissents, but they did not urge that a taxpayer's selfserving testimony as to a previous state of mind should be decisive, and as to this point the court appeared unanimous.

It would seem the *Goodman* evaluation should be *a fortiori* when a taxpayer locks an intent in his breast, manifesting by words or deeds a contrary intent for the edification of the other parties with whom he transacts business. However genuine the secret intent may have been, it is not normally the kind of intent that can be controlling in the administration of the tax laws. If this salutary principle is remembered, the mind can remain open to applying the *Corn Products* doctrine to a stock purchase to secure employment in a proper case, without giving rise to the evils that concern the defendant.

Troxell and Noall, *cit. supra*, say "It is impossible to predict the outer boundaries of this rapidly expanding concept." (p. 204). " * * * the process of the erosion of traditional concepts of capital assets has not been completed * * *." (pp. 207, 208). They urge further judicial refinement and say that "A clarification of the law by the Supreme Court would be appropriate." (p. 208).

Other commentators also call attention to the onesided success of taxpayers in using *Corn Products* for their purposes, contrary to the Supreme Court's apparent belief it was closing a loophole, and urge that a regulation require purchasers of securities to notify the IRS shortly after purchase if they intend to claim the purchase was not for investment. The Yale Law Journal Note, *cit. supra;* Kauffman, *cit. supra.* This has not been done, but without such a regulation the courts should achieve at least part of its purpose by recognizing the sound standard of proof of noninvestment intent here urged.

Statements are commonly made in other branches of tax law that courts cannot rectify tax inequalities by imputing to Congress an unexpressed intent to achieve uniformity and then rewriting what Congress actually put in words, *e. g.*, Fitch Co. v. United States, 323 U.S. 582, 587, 65 S.Ct. 409, 89 L.Ed. 472 (1945). In Shakespeare Company v. United States, 419 F.2d 839, 189 Ct.Cl. —— (decided today) the opinion the court adopts as its own says "Courts are powerless to rewrite tax statutes, however appealing it may be.", citing *Fitch.* 419 F.2d at pp. 843, 844. I joined in that opinion, thinking the statement at least ought to be true, and no doubt generally it is. The branch we are now concerned with is, therefore, somewhat anomalous. The case before us is indeed a hard one and Congress surely should have provided for it. Before we strapped on our armor and leaped on our

white horse, however, it seems to me we should have considered. It is not unheard of in framing our opinions, when they are felt to be innovative in approach, to add, even if dictum, a warning that the innovation has limits. *E. g.,* Sullivan v. United States, 416 F.2d 1277, 189 Ct.Cl. —— (decided October 17, 1969). If the opinion the court today adopts as its own had done this I would not find it as had to swallow as I do. Instead, it seems only to say that we have put on a good deal of speed already and therefore we should not hesitate to put on more. The innovative nature of the decision proposed is not even recognized as a reason for caution. In dealing with a doctrine commentators already seem to regard as open-ended, we should not contribute as we do today to foster that belief. Such strictures should warn us the time has come to think again about that departure point, now long forgotten, the language used by Congress, to determine our bearings and distance with respect to it, and to plot a course having what all courses ought to have, a destination.

This view of the case makes it unnecessary to determine whether the agency, as it was or as plaintiff thought it was, constituted the kind of "long-term (capital) right" visualized in Freeman's commentary. Also, it is unnecessary to determine whether to obtain ordinary loss treatment, plaintiff is required to show it intended to dispose of the stock at a definite or ascertainable future date, a point much debated by counsel herein, or any other ground on which it could be said that the transaction here was not entitled to be called an ordinary loss.

I would hold, therefore, that plaintiff has failed, as a matter of ultimate fact, to prove that it purchased the involved corporate stock as a business expense rather than as an investment.